2013 VT 51

## State of Vermont v. Michele Irene Amsden

[75 A.3d 612]

No. 12-128

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed July 12, 2013

*Kerry A. McDonald-Cady*, Windham County Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant appeals convictions on charges of disorderly conduct and cruelty to a child stemming from her four-year-old son's exposure to dangerous and unsanitary conditions under a bridge and defendant's disruptive behavior inside a hospital. We affirm both convictions as legally sound and supported by the evidence.

¶ 2. The facts, including relevant testimony from the one-day bench trial, may be summarized as follows. In September 2010, police went in response to a tip to a Brattleboro bridge to perform a welfare check on a four-year-old child. Under the bridge, police discovered defendant engaged in an apparent sexual act with a man while defendant's son was a few feet away. At trial, one of the officers described the area, which was adjacent to a brook, as "littered with trash, glass, urine, [and] feces." Another officer testified to the presence of "trash everywhere, broken glass, feces [and] urine." The child, who was standing ten feet from the brook beneath the bridge, was barefoot and wore only soiled shorts. Consistent with the officers' testimony, the trial court found that there was no impediment of any sort between the child and the brook. When the officers arrived, the child walked some twenty feet to them while defendant continued to engage in sexual activity without any apparent awareness of her son's location or the presence of the officers. The judge found that only when the officers directly addressed defendant, telling her to put her shorts on, did she realize that her son had moved. While speaking with the officers, defendant was unsteady, could not maintain her balance, and slurred her words incoherently. In response to the officers' request, defendant tried unsuccessfully to put shoes on the child and then instead directed him to a filthy sleeping bag and pillow to go to sleep.

¶ 3. Rather than allowing the child to remain under the bridge, one of the officers led the child up the embankment toward the parked police cruisers. Another officer tried to get defendant to climb the slope, as well. According to one officer's testimony, defendant had difficulty scaling the slope and at one point called to her son to return and help her. Defendant then grabbed the

child. The officers pried the child from mother, whose grip appeared to hurt him, and took him the rest of the way up the hill, after which they placed him in another cruiser that took him away. At no time did defendant attempt to comfort her son. Meanwhile, the officers continued to try to get defendant to the roadway. One testified that defendant refused, screaming and throwing herself to the ground. The officer testified that she handcuffed defendant before attempting to climb the hill again because of defendant's demeanor. The trial court found that as defendant attempted to scale the slope, she stumbled and fell, presumably because of her extreme intoxication.

¶ 4. After eventually getting to the top of the slope, defendant continued to argue with police, disobeying commands to approach the roadway, dropping to the ground and refusing to move. The trial court found that as defendant went limp, she hit her head and injured herself.[1] Officers placed her in the cruiser and took her to a nearby emergency room. At the hospital, defendant refused to get out of the cruiser. The officers eventually got defendant into the hospital, where she continued to shout. The officers placed defendant in a so-called safe room, designed to keep patients from hurting themselves or disturbing others. Defendant repeatedly tried to leave the room and was eventually handcuffed to the bed. She banged the bed against the wall so much that it had to be moved.

¶ 5. For a week before these incidents took place, defendant's son had spent the night at the home of a woman employed by a preschool program. The preschool employee had agreed to care for defendant's son from time to time because of defendant's "circumstances and periodic homelessness." The trial court found that the preschool employee's apartment was appropriate and safe for a child. On the afternoon of the day police performed the welfare check, the woman had expected to pick defendant's son up from school to spend the night at her apartment. As she was heading to the school, she happened upon defendant and her son at a local market. Defendant told the woman that she wanted her son to spend the evening with her and that they had a place to stay with a friend. Police later found defendant and her son under the bridge.

---

[1] There is disagreement regarding how defendant sustained the injury, but determining its origin has no bearing on the resolution of this case.

¶ 6. Defendant was charged with one count of disorderly conduct in violation of 13 V.S.A. § 1026 and one count of cruelty to a child in violation of 13 V.S.A. § 1304. Defendant was convicted on both counts and timely appealed.

¶ 7. With respect to the disorderly-conduct charge, defendant contends that the acts alleged were not voluntary because police forcibly removed her from a location where her intoxication presented no risk of public inconvenience or annoyance, and placed her in the hospital where her conduct was allegedly disruptive. Defendant also argues that her conduct at the hospital did not constitute "violent and tumultuous" behavior of the type that would support a conviction for disorderly conduct and that the State failed to prove she acted with any intent to cause risk of such harm. With respect to the child-cruelty charge, defendant maintains that the evidence adduced fell short of demonstrating the requisite threat to the child's health or welfare, that the statute does not criminalize conduct that exposes children to speculative or minor danger, and that the trial court misconstrued the applicable mens rea requirement. We address each charge and argument in turn.

¶ 8. We review the trial court's factual findings following a bench trial under a clear-error standard. See *State v. Godfrey*, 131 Vt. 629, 630, 313 A.2d 390, 391 (1973) ("[T]he findings of the lower court must be affirmed if there is any credible evidence to support them . . . ."); accord *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011) ("We use the same standard of review in bench trials and in jury trials in evaluating the sufficiency of the evidence."). That is to say, "[w]hen considering a challenge to the sufficiency of the evidence, the Court must determine if the evidence, viewed in the light most favorable to the State and excluding modifying evidence, fairly and reasonably supports a finding beyond a reasonable doubt." *State v. Vargas*, 2009 VT 31, ¶ 18, 185 Vt. 629, 971 A.2d 665 (mem.) (quotation omitted). As always, we review the trial court's legal conclusions, including those related to statutory interpretation, de novo. See *State v. Therrien*, 2011 VT 120, ¶ 9, 191 Vt. 24, 38 A.3d 1129.

I

¶ 9. Defendant first challenges her conviction for disorderly conduct under 13 V.S.A. § 1026, arguing that her presence in the hospital was not voluntary and that, in any event, her behavior at

the hospital was insufficient to trigger criminal liability under the statute.

## A

■ ¶ 10. Defendant asserts that her presence in the hospital, a public place, was not voluntary and that she cannot therefore be held criminally liable for creating a disturbance there. We disagree. Vermont's disorderly conduct statute states in relevant part: "A person who, with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof: (1) Engages in fighting or in violent, tumultuous or threatening behavior . . . shall be imprisoned for not more than 60 days or fined not more than $500.00 or both." 13 V.S.A. § 1026. A defendant may be found guilty of disorderly conduct based on behavior that occurs during an arrest. See State v. Begins, 147 Vt. 45, 47, 509 A.2d 1007, 1009 (1986) (rejecting argument that once DUI arrestee was placed in a police cruiser, "her actions were no longer occurring in a public place"); see also State v. Cole, 150 Vt. 453, 554 A.2d 253 (1988) (attempt to grab arresting officer's flashlight during arrest sufficient for disorderly conduct where it occurred on a public roadway). Similarly, defendants may be convicted of disorderly conduct based on conduct that occurs after arrest. State v. Lund, 144 Vt. 171, 174, 475 A.2d 1055, 1058 (1984) (defendant convicted of disorderly conduct for attempting to bite sheriff's hand while in sheriff's office where he was being processed for driving under the influence), overruled on other grounds by State v. Begins, 148 Vt. 186, 189, 531 A.2d 595, 596-97 (1987).

■ ¶ 11. Here, defendant was effectively under arrest. She had been placed in handcuffs after police personally observed conditions under the bridge that would give rise to probable cause to believe that defendant committed an offense of cruelty to a minor under 13 V.S.A. § 1304. As we noted above, violent and tumultuous behavior at a police station would be sufficient to support a conviction for disorderly conduct. Arrestees, by virtue of their detention, are by definition involuntarily held. In this case, defendant's injuries — regardless of their origin — simply necessitated a trip to the hospital for treatment before going to the police station. Where legally sufficient violent, tumultuous, or threatening behavior in an arguably less public place, such as a sheriff's office or police station, may support a conviction for

disorderly conduct, then the same behavior within a hospital must also permit conviction for disorderly conduct. See *Lund*, 144 Vt. at 179, 475 A.2d at 1061 (disorderly conduct occurs in a place "open to common or general use") (quotation omitted). Although not controlling, we have previously affirmed a disorderly-conduct conviction for behavior that occurred in a hospital examining room that was challenged on other grounds. See *State v. Read*, 165 Vt. 141, 144, 680 A.2d 944, 946 (1996).

¶ 12. Defendant likens her situation to that of a drunk person who is removed from his home involuntarily and then charged with the crime of public intoxication. See *Martin v. State*, 17 So. 2d 427, 427 (Ala. Ct. App. 1944). We find this argument unpersuasive given our prior precedent relating to detainees' and arrestees' ability to commit disorderly conduct even once under police control. Moreover, defendant's position differs materially from that of someone charged with public intoxication. Under our disorderly conduct statute, it is not necessary that a defendant voluntarily be present in a public place, but rather that a defendant voluntarily engage in violent, tumultuous, or threatening behavior while in a public place. That is to say, it is defendant's behavior and not her condition that is prohibited. Under statutes criminalizing public intoxication, a defendant's mere presence in public while inebriated — sometimes coupled with other behaviors — is prohibited. When a person already intoxicated is transported from a private location into public, the public-presence element is accomplished involuntarily. Here, defendant's mere presence in a particular place was not the voluntary act subject to criminal penalty. Instead, it was her voluntary behavior in a place that happened to be "open to common or general use." *Lund*, 144 Vt. at 179, 475 A.2d at 1061. Why and how defendant arrived at the hospital is not determinative.

¶ 13. The trial court concluded that, once inside the hospital, defendant recklessly engaged in behavior that constituted disorderly conduct. While defendant might have preferred to remain under the bridge or elsewhere, making her presence in the hospital and later in jail involuntary, there is no indication that the behavior alleged to violate the disorderly conduct statute was anything other than voluntary.

### B

¶ 14. Defendant also contends that the evidence failed to establish that her actions were "violent and tumultuous" or that she recklessly created a risk of public inconvenience or annoyance. We conclude that the evidence was sufficient to support the trial court's conclusions on these points.

¶ 15. The relevant portion of the disorderly conduct statute states that a defendant is guilty when he or she "with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof: (1) Engages in fighting or in violent, tumultuous or threatening behavior." 13 V.S.A. § 1026. The statute refers to the elements of violence and tumultuousness in the disjunctive. Nevertheless, defendant was specifically charged with "recklessly creat[ing] a risk of public inconvenience or annoyance when she engaged in violent *and* tumultuous behavior at the [hospital] [e]mergency [r]oom. See *State v. Aiken*, 2004 VT 96, ¶ 11, 177 Vt. 566, 862 A.2d 285 (mem.) (State bound when language in charging document and accompanying affidavits narrows and specifies conduct alleged); see also *State v. Nichols*, 167 Vt. 566, 567, 702 A.2d 77, 78 (1997) (mem.) (surplusage in disorderly-conduct charging document raises State's burden).

¶ 16. In analyzing the disorderly conduct statute under different circumstances, we have previously cited dictionary definitions of tumult that include not only "commotion and agitation of a large crowd" but also a "violent outburst." *Lund*, 144 Vt. at 178-79, 475 A.2d at 1060 (quotation omitted). In *Lund*, an inebriated man who drove to a sheriff's office to post bail for a friend became involved in a confrontation with the sheriff, who, after smelling alcohol on the man's breath, said he would process him for driving under the influence. *Id.* at 173, 475 A.2d at 1057. Authorities charged defendant there with disorderly conduct for behavior that included: (1) replying to questions with profanity; (2) repeatedly standing back up after being instructed to sit down while making obscene comments about the sheriff; (3) attempting to bite the sheriff; and (4) struggling and resisting while being led to the holding cell. *Id.* at 173-74, 475 A.2d at 1058. We affirmed the defendant's conviction. Although the defendant there did not challenge the sufficiency of the conduct but rather its capacity to disrupt the public inside the lightly populated office, it is nevertheless obvious that we considered his "outburst" to be the sort of

"tumultuous behavior" contemplated by the statute. *Id.* at 179, 475 A.2d at 1060-61.

¶ 17. Here, the trial court concluded beyond a reasonable doubt that defendant had committed each element as charged, basing its decision on the factual findings we noted above. Among them: Police had to physically walk defendant into the hospital by holding onto her sides and "moving her along." Defendant was so loud and disruptive inside the emergency room that she had to be placed in the safe room. Because defendant continued her disruptive behavior while in the safe room, the hospital staff closed the door to avoid disturbing people in the emergency room. Defendant also tried to get by the officers and leave, after which she was handcuffed to the bed.[2] After being handcuffed to the bed, she banged it into the wall with such force that it had to be separated from the wall to avoid damage.

¶ 18. Taken as a whole, this conduct is sufficient to support the trial court's conclusion that defendant engaged in criminally tumultuous behavior. We similarly conclude that defendant's behavior, as found by the trial court, constituted the type of violent comportment criminalized under the disorderly conduct statute. As we have previously observed, "[t]he term 'violent' [as used in the statute] contemplates a wide range of inappropriate behavior." *State v. O'Connell*, 147 Vt. 60, 67, 510 A.2d 167, 171 (1986). In *O'Connell*, we affirmed the conviction of a defendant charged with disorderly conduct for "recklessly creat[ing] a risk of public inconvenience by engaging in violent behavior" when he struck a woman's arm as she and another woman walked shoulder to shoulder down the side walk in the direction opposite his. *Id.* at 66, 510 A.2d at 170-71. The encounter left a red mark on the woman's arm. *Id.* at 62, 510 A.2d at 168. The defendant in *O'Connell* maintained that his behavior was rude, but no more severe than what normally occurs when attempting to negotiate a crowd. We held, however, that the defendant's conduct satisfied even his own proposed definition of violent, which included not only "furious, severe, vehement, extreme, [or] intense" behavior

---

[2] Defendant correctly notes that the trial court did not make the explicit findings that the State on appeal urges with respect to the allegedly violent nature of defendant's conduct during her attempt to leave the room. Although the testimony would have supported the findings upon which the State relies in its briefs, the trial court did not make them. For purposes of this appeal, we consider only those findings made by the trial court.

but also "unjust or improper force." *Id.* at 67, 510 A.2d at 171 (quotation omitted). In *Begins*, we affirmed a conviction under § 1026(1) where a defendant, "in addition to yelling and screaming, . . . kicked and resisted arrest and had to be restrained with ankle cuffs, handcuffs, and a seatbelt." 147 Vt. at 47, 509 A.2d at 1008. Of course, these cases merely illustrate the type of "violent" conduct previously held sufficient to justify a conviction under our disorderly conduct statute. They do not necessarily prescribe a floor.

¶ 19. Where the statute does not specifically define a term, courts resort to the common understanding of a term. *Carter v. Gugliuzzi*, 168 Vt. 48, 52, 716 A.2d 17, 21 (1998). The adjective "violent" is defined as, among other things, "[o]f, relating to, or characterized by strong physical force." Black's Law Dictionary 1601 (8th ed. 2004). Another common definition for "violent" is "[m]oving, acting, or characterized by physical force, esp[ecially] by extreme and sudden or by unjust or improper force." Webster's New International Dictionary 2846 (2d ed. 1961). The trial court found that defendant repeatedly tried to leave the room. Although the trial court did not explicitly find that defendant did so in an aggressive manner, it is clear that she attempted to leave with enough insistence and persistence that she had to be handcuffed to her bed. While that, in and of itself, might be insufficient to constitute violent conduct, her behavior once secured certainly did. The trial court found that she repeatedly banged the bed into the wall so that, it had to be moved. Such intense physical behavior, particularly where it threatened property damage, is sufficient to constitute unjust and improper force. Thus, taking the court's findings as a whole, we are persuaded that defendant's behavior was of the sort that the disorderly conduct statute sought to prohibit in places accessible to the public.

¶ 20. Defendant quarrels with the trial court's conclusion that defendant "maintained a steady stream of screamed obscenities" while inside the hospital. Even assuming that defendant did not engage in an expletive-laced tirade of the sort the trial court attributed to her, the remainder of the conduct found is supported by the record and sufficient to support the court's legal conclusion.

¶ 21. Finally, defendant contends that, even if her conduct was both violent and tumultuous, the State failed to establish that she recklessly created a risk of public annoyance. Her argument is

two-fold. On the one hand, defendant argues that hospital emergency rooms are inherently unruly places, dedicated to the treatment of patients experiencing acute injuries and distress, and, as a result, any disruptive violent and tumultuous behavior is neither a public inconvenience nor annoyance but rather an expected, natural occurrence in a hospital environment. On the other, defendant contends that absent any evidence that defendant was aware of the possibility of creating a risk of public annoyance, she could not be convicted of recklessly doing so.

¶ 22. With respect to defendant's first contention, defendant argues essentially that the standard of behavior demanded by the statute shifts depending on the context. Although it may be true that the risk of public inconvenience and annoyance may vary in relation to the environment, we have rejected a similar argument with respect to the separate, abusive-language provision of the same statute. See *Read*, 165 Vt. 141, 680 A.2d 944. In *Read*, we declined to demand that abusive language directed at a police officer be of a more egregious nature than language directed at an average citizen to trigger the statute's sanctions for fighting words because police officers allegedly receive training to remain calm in the face of conflict. *Id.* at 149, 680 A.2d at 949. It is noteworthy that in *Read*, we affirmed a conviction under the abusive-language portion of the statute for conduct inside a hospital. While a hospital emergency room may not necessarily be tranquil because injured patients may be unable to control their behavior, there is no reason to suppose that administrators do not strive to make it as calm as possible. Here, defendant's decision to add to the existing atmosphere of an emergency room by voluntarily engaging in a loud, obnoxious, and violent course of conduct without reason or medical excuse would itself create a sufficient risk of *additional* public inconvenience to sustain her conviction under the statute.

¶ 23. We also reject defendant's contention that the State failed to adduce evidence that would prove defendant was aware that her conduct would create a risk of public inconvenience or annoyance. Defendant was charged with *recklessly* creating a risk of public inconvenience or annoyance. Our disorderly conduct statute is directly based on the Model Penal Code. See *Read*, 165 Vt. at 147, 680 A.2d at 948. We have expressly endorsed the Model Penal Code's definition of recklessness, which states:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

*State v. Brooks*, 163 Vt. 245, 251, 658 A.2d 22, 26 (1995) (quoting *State v. O'Connell*, 149 Vt. 114, 115 n.1, 540 A.2d 1030, 1031 n.1 (1987) (quoting Model Penal Code, § 2.02(c))). The qualitative nature of the risk, that is to say, whether the risk is "substantial and unjustifiable" in light of the nature, purpose and circumstances of a defendant's conduct, is measured from an objective standpoint. See *id.* at 251, 658 A.2d at 26-27. Whether a defendant actually perceives that risk, however, is a subjective inquiry. *Id.* ("Recklessness requires a conscious disregard of the risk."). The trial court characterized the risk of public inconvenience from defendant's actions as "substantial and unjustifiable," a conclusion based, in part, on the fact that the disturbance occurred in a place where ill and injured people seek medical treatment. From an objective standpoint, it is reasonable to conclude, as the trial court apparently did, that any additional, and unnecessary physical outbursts would further distress vulnerable patients and risk distracting staff in its attempt to provide professional care. We agree also that if defendant was, in fact, subjectively aware of this risk and behaved in this fashion that that behavior would constitute "a gross deviation from the standard of conduct that a law-abiding person would observe in the [same] situation." *Id.* at 251, 658 A.2d at 26.

¶ 24. We conclude that the trial court also properly analyzed defendant's subjective awareness of that risk, as required for the mens rea of recklessness. The trial court characterized the risk of public annoyance and inconvenience as "a risk about which any person would have been aware." The trial court then concluded that "[d]efendant's ignoring of that substantial risk was consequently a gross deviation from the standard of conduct that any law abiding person would have observed under the same circumstances." Although the trial court did not expressly state that defendant was subjectively aware of the risk her behavior created,

it is obvious that the trial court concluded that she was. First, the trial court noted that "any person *would* have been aware" of the risk; it did not say that anyone *should* have been aware as the court would have if it were merely applying the lesser criminal-negligence standard. Coupled with trial court's conclusion that "defendant's ignoring" of the risk, which implies an active disregard rather than a mere unawareness, was a gross deviation from a reasonable standard of conduct, it is plain that the trial court believed that defendant was aware of the risk of disturbance created by her behavior.

¶ 25. Contrary to defendant's assertion, the State presented more than enough circumstantial evidence to conclude beyond a reasonable doubt that defendant was conscious of the risk. See *Cole*, 150 Vt. at 456, 554 A.2d at 255 ("Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence."); cf. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (holding in applying criminal law recklessness standard to Eighth Amendment violations that fact finder may infer subjective knowledge of a risk from circumstantial evidence and that such an inference is permissive, not mandatory). As we have observed, the conduct giving rise to the criminal liability is confined to that which was charged. Thus, in this case, the actions that may constitute the basis for the disorderly conduct conviction are those that occurred inside the hospital. Defendant's conduct during the events leading up to the hospital visit, however, are probative with respect to her mental state at the time of the alleged disorderly conduct. The trial court found that, upon arrival at the hospital, defendant refused to get out of the police cruiser for treatment. One of the police officers who brought defendant through the emergency room as she continued to resist testified to observing medical staff, meaning that the trial court could reasonably conclude that defendant's ongoing outbursts had the potential to disrupt patient care. The other officer testified that defendant's screams and shouting echoed throughout the emergency room. The same officer testified that defendant went limp outside the door to the safe room and officers had to drag her in and up onto the bed. The officers testified that defendant's behavior inside the hospital was largely a continuation of disruptive and combative conduct in which she had engaged while being transported and since her encounter with the police under the bridge. On the basis of this testimony, and

defendant's continuing conduct once inside the so-called safe room, the trial court could reasonably infer that defendant was aware of the substantial and unjustifiable risk of public inconvenience or annoyance created by her behavior and thus consciously disregarded it. We therefore affirm defendant's conviction for disorderly conduct.

## II

¶ 26. Defendant also appeals her conviction for cruelty to a child. Defendant argues that the evidence did not support the trial court's conclusion that the environment under the bridge was dangerous and unhealthy, but instead proved a speculative risk of harm that is insufficient as a matter of law to establish criminal liability under 13 V.S.A. § 1304.[3] Defendant also contends that the court erred in its application of the requisite mens rea. We disagree.

¶ 27. Criminal cruelty to a child under the relevant statute occurs when:

> A person over the age of 16 years, having the custody, charge or care of a child under 10 years of age, who wilfully assaults, ill treats, neglects or abandons or exposes such child, or causes or procures such child to be assaulted, ill-treated, neglected, abandoned or exposed, in a manner to cause such child unnecessary suffering, or to endanger his or her health . . . .

13 V.S.A. § 1304. Defendant was specifically charged with violating this statute by "willfully caus[ing] [her son] to be neglected or exposed in a manner to endanger his health."

 ¶ 28. Defendant first disputes the trial court's conclusions that the environment was dangerous and unhealthy and that defendant's son was left unsupervised. Based on the officers' testimony, the court concluded that the area adjacent to the bridge abutment was "by any observable standard dangerous and unhealthy for any child, especially one who was not yet five years of age." The court's findings with regard to the lay-out of the area around the bridge and its physical condition are factual and, thus, subject to a deferential standard of review. See *Vargas*, 2009 VT

---

[3] The trial court's order erroneously refers to 13 V.S.A. § 1305. The statute regarding child cruelty, as charged here, is 13 V.S.A. § 1304.

31, ¶ 18. We conclude that the record contains more than enough evidence to establish that the bridge abutment was, in fact, "dangerous and unhealthy."

¶ 29. As the officers testified, the area contained broken glass, feces, and urine. The area also was directly adjacent to a brook, access to which was unimpeded by any protective barrier. The officers testified that, when they arrived, the child was without a shirt and barefoot. The officers testified that defendant did not notice their approach or that her child had wandered away; instead her attention remained fixed on her companion. Even if defendant had been aware of her child's movements in this obviously dangerous area, the trial court concluded she would have been unable to assist him, if needed, because of her inebriation. This was a conclusion based on testimony of the officers, who indicated that defendant was so intoxicated that she was unsteady and incapable of even placing shoes on the child's feet. Because defendant did not and could not adequately supervise her son in this environment filled with potential hazards, it was reasonable for the trial court to conclude that it was, in fact, a dangerous and unhealthy area and a dangerous and unhealthy situation.

¶ 30. Defendant nevertheless argues that that danger constitutes merely a speculative risk of harm not covered by the statute.[4] More specifically, defendant argues that the risk of injury and the severity of any potential harm were too low to be considered criminal under the statute. Again, we cannot agree.

¶ 31. Whether the conduct is legally sufficient to trigger criminal liability is a question of statutory interpretation that we review de novo. See *Therrien*, 2011 VT 120, ¶ 9. Subject to proof of certain other elements, the statute criminalizes willful neglect or exposure of a child in a defendant's care "in a manner . . . to endanger his or her health." 13 V.S.A. § 1304. "Endanger" means "to put to hazard; to bring into danger or peril." Webster's International Dictionary 843 (2d ed. 1961); see also Webster's New

---

[4] We decline to consider the State's argument — raised for the first time on appeal — that this Court should consider whether defendant caused the child "unnecessary suffering" rather than endangering his health. Defendant was charged with conduct that caused the child "to be neglected or exposed in a manner to endanger his health." When specific conduct is alleged in the charging document, the State is bound by those allegations. *State v. Kolibas*, 2012 VT 37, ¶ 14, 191 Vt. 474, 48 A.3d 610.

Collegiate Dictionary 375 (1977). "Danger," in turn, refers to "exposure or liability to injury, pain, or loss." Webster's New Collegiate Dictionary 287 (offering — appropriately — the usage example "a place where children could play without [danger]"). We therefore conclude that "the term refers to a potential or possibility of injury. The term does not refer to conduct that will result or actually results in harm, but rather to conduct that could or might result in harm." *People v. Collins*, 824 N.E.2d 262, 266 (Ill. 2005). Here, the trial court found that the location under the bridge was inherently dangerous because it contained, among other hazards, broken glass and feces and an easily accessible brook. The threat to the child's health was sufficiently concrete. The risk, which might include everything from lacerations to infection to drowning, also was sufficiently severe. We have no difficulty agreeing with the trial court's conclusion that defendant endangered the child by bringing him to this dangerous place and then ignoring him.

¶ 32. With respect to the mens rea requirement, defendant is partially correct in her assertion that the trial court erred in its statutory analysis. The court relied on its own grammatical analysis and our holding in *In re Greenough*, 116 Vt. 277, 75 A.2d 569 (1950), to conclude that only defendant's actions in exposing or neglecting her child needed to be willful and that the result of those actions — that a child's health be endangered or that a child suffer unnecessarily — was a wholly separate "element" of the crime apparently not subject to any requisite level of criminal intent.[5] Nevertheless, the trial court also concluded beyond a reasonable doubt that, if knowledge were a requirement, defendant was aware of the conditions that endangered her child. It is on this latter basis that we affirm.

¶ 33. Under the relevant portion of the statute, a person is guilty of cruelty to a child when she "wilfully . . . neglects . . . or exposes such child . . . in a manner . . . to endanger his or her health." 13 V.S.A. § 1304. As defendant properly notes, the latter portion is an adverbial phrase, modifying the act of neglecting or exposing a child. An adverbial phrase:

> describes a verb, an adjective, or adverb. To find out if a
> prepositional phrase is functioning as an adverbial

---

[5] As we explain below, the portion of the statute relating to "danger" refers to a manner of exposing or neglecting and not a specific result.

phrase, see if it answers one of these questions: "Where?" "When?" "In what manner?" "To what extent?"

*In re Arnold,* 471 B.R. 578, 602 (Bankr. C.D. Cal. 2012) (quoting Rozakis, *English Grammar for the Utterly Confused* 103 (2003)). As such, it is not an unrelated element but rather one that must be understood in relation to the verbs it modifies: It therefore defines the manner or scope of neglect or exposure that constitutes the proscribed conduct. The phrase "in a manner to endanger" can have no meaning independent of the verbs it modifies in this statute. Nor can the verbs as used in this statute be understood without reference to the modifying phrase. See *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989) (interpretation of statute "mandated by the grammatical structure"). The proscribed act, then, is not simply neglecting or exposing; it is neglecting or exposing in a specific manner: in a manner to endanger the child's health or welfare. To trigger criminal liability, the mental state that must accompany this unitary act is willfulness. See *Flores-Figueroa v. United States,* 556 U.S. 646, 650 (2009) (noting that "[a]s a matter of ordinary English grammar, it seems natural to read [a] statute's [mens rea element] 'knowingly' as applying to all the subsequently listed elements of the crime"); see also *United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994); *Liparota v. United States,* 471 U.S. 419 (1985).

■■■ ¶ 34. That is not to say, however, as defendant urges, that the statute criminalizes only acts the conscious object of which are to endanger or harm a child. We have long acknowledged that willful conduct is, at a minimum, conduct undertaken "intentional[ly] and by design, as distinguished from that which is thoughtless or accidental." *Town of Fletcher v. Fezer,* 73 Vt. 70, 71, 50 A. 558, 558 (1901); see *State v. Parenteau,* 153 Vt. 123, 127, 569 A.2d 477, 480 (1989) (standard of willful conduct satisfied when conduct undertaken "consciously and purposefully"). As a logical matter, to intentionally and designedly — or consciously and purposefully — expose or neglect a child in a manner that endangers that child, a defendant must have some knowledge of those dangerous conditions. See *Flores-Figueroa,* 556 U.S. at 650 ("Would we apply a statute that makes it unlawful '*knowingly* to possess drugs' to a person who steals a passenger's bag without knowing that the bag has drugs inside?"). We conclude that it is sufficient that a

defendant consciously and purposefully cause a child to be exposed to conditions that she knows endanger his health. Accord *People v. Jordan*, 843 N.E.2d 870, 879 (Ill. 2006) (state "required to prove that defendant knew he was endangering the life or health of his child when he left her alone in his vehicle" when defendant charged with willfully causing or permitting a child to be endangered).

¶ 35. Here, there was ample evidence to support the trial court's inference that defendant was subjectively aware of the hazards present under the bridge and then exposed her son to them. Chief among them, the trial court observed that the conditions were apparent and obvious to anyone. There is no suggestion that defendant accidentally or thoughtlessly took her son to an area she knew to be dangerous. The trial court could reasonably conclude on the basis of the evidence that defendant willfully caused her son to be neglected in a manner to endanger his health.

¶ 36. Defendant asserts that to affirm her conviction on the basis of this record would mean that "every parent who inadvertently allows a child to wander twenty feet barefoot in an area where there may be some hazards on the ground would be subject to prosecution." This argument is premised on an inaccurate description of the alleged criminal conduct, which was much broader than what defendant recites. The State did not allege, and the trial court did not conclude, that defendant "inadvertently allow[ed]" her child to wander in a potentially hazardous area. Rather, the trial court found not only that defendant deliberately brought her child to the bridge — despite previous arrangements for him to remain in the care of another adult in a safe environment — but also that defendant did so with the knowledge that the area was unsanitary and hazardous. At some point, defendant became so intoxicated that she could not properly supervise him. While at the bridge, she was so engrossed in a sexual liaison that she did not realize her son had walked off toward the police. Nor does defendant's characterization of the environment as one "where there may be some hazards on the ground" accurately jibe with the conditions under the bridge. Glass, feces and trash littered an area adjacent to a brook to which her young child had unfettered access. Thus, our conclusion that defendant's conduct satisfies the requirements of 13 V.S.A. § 1304 is not based on behavior that is mere inadvertence or

exposure to a vague, unforeseeable hazard. Moreover, defendant's own argument with respect to the applicability of the requisite mens rea contradicts the notion that our holding will lead to limitless prosecutions of hapless parents. In this case, the child-endangerment statute was applied to defendant's specific course of willful conduct, which posed a real, immediate danger to the child's welfare.

*Affirmed.*