NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 20

No. 24-AP-094

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Criminal Division |
| | |
| Stacey Lynn Vaillancourt | March Term, 2025 |

Cortland Corsones, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **WAPLES, J.** Defendant Stacey Vaillancourt appeals her convictions for involuntary manslaughter and cruelty to a child with death resulting. She argues that the court erred in denying her motion for judgment of acquittal because the State produced insufficient evidence to support the jury's verdicts; that the verdicts were inconsistent or, in the alternative, that convictions for both crimes violate double jeopardy; and that the court erred in admitting videos of the victim. We affirm.

¶ 2. The following evidence was introduced at trial. Defendant operated a daycare facility in her home and had done so for twenty-six years prior to the events at issue here.

Defendant's son and his fiancée lived in their own unit within defendant's home, and occasionally helped her provide care.

¶ 3.     Six-month-old H.B. was a happy baby.  She could hold her head up, push herself up with her arms, pick up small items like her bottle, and could "squirm move" but could not quite crawl.  She was not "a very good sleeper" and "didn't like to sleep unless [someone was] holding her."  In January 2019, she would take two or three naps during the day, ranging in duration from ten to forty-five minutes.  She would only nap in someone's arms, because she would wake up if placed into her crib or swing.

¶ 4.     On January 22, 2019, H.B.'s parents dropped her off at defendant's daycare for the first time.  H.B.'s mother brought supplies for defendant to use in caring for H.B., including "diapers, wipes, brand new bottles, unopened formula, some baby food," some clothing, and a bottle of Tylenol that H.B.'s pediatrician prescribed for her teething discomfort.  When mother picked up H.B. at the end of the day, H.B. was "normal" if maybe "a little tired."  On January 23, mother again dropped H.B. off at defendant's daycare.  When mother picked her up at the end of the day, she "seemed a little fussy and tired, [and] more tired than normal."  H.B. napped for over an hour after getting home, and did not sleep that night.  H.B.'s parents took turns holding her overnight because she would not sleep.

¶ 5.     Mother dropped off H.B. again in the morning of January 24.  That day, defendant's son and his fiancée were sick with food poisoning.  Defendant was the only person who worked at her daycare that day.  Defendant's son stopped by the daycare in the late morning to see if things were going okay, saw that everything was quiet and fine, and then went back to sleep.  Son did not speak to defendant and assumed that all the daycare kids were sleeping since everything was quiet.

¶ 6.     In the afternoon of January 24, Defendant fed H.B. her second bottle for the day and put her down for a nap in her crib with a blanket.  Defendant checked on her frequently and noted that she was "breathing a little bit heavy" and kept pulling the blanket up.  At 3:00 p.m.,

defendant found the infant unresponsive in the crib. Defendant yelled for help and banged on her son's door. She told her son and his fiancée that H.B. "wasn't breathing" and that she had performed CPR but had not found a pulse. Son, who was studying to become a nurse, took H.B. from defendant's arms and began performing CPR. He asked his fiancée to call for EMTs. Son did not find traces of a pulse or breathing. He noted signs of cyanosis, a sign of oxygen deprivation, around H.B.'s nose and mouth. He continued administering CPR until EMTs arrived.

¶ 7. Defendant's tenant, who was upstairs and heard commotion, came down to the daycare. Defendant was shaking so badly in trying to text H.B.'s mother that tenant took the phone and texted mother. Mother called defendant immediately, but an EMT picked up and told her that H.B. was having trouble breathing. Mother called father and told him to rush to the hospital.

¶ 8. EMTs took H.B. to the hospital via ambulance and continued emergency care for her. Mother and father met at the hospital, where they saw H.B. "really pale" on a table, surrounded by nurses and doctors giving her CPR. H.B.'s condition did not improve, and doctors declared her dead shortly after her arrival.

¶ 9. After EMTs removed H.B. from the daycare, defendant prepared the other children for pickup and cleaned up. She did laundry, including washing the clothes that H.B. had been wearing and the blanket from the crib. Defendant called the hospital later that afternoon and stated, "I'm so sorry" and that H.B. "must have pulled the blanket over her face."

¶ 10. The next day, Vermont's chief medical examiner conducted an autopsy of H.B. She determined that the cause of H.B.'s death was diphenhydramine intoxication. Diphenhydramine is an antihistamine contained in products like Benadryl, intended to block some allergic reactions. The medical examiner explained that diphenhydramine also has a "sedating effect" because it is a "central nervous system depressant." In children, the drug can "cause profound respiratory depression or other cardiac events that can result in death." The instruction label on Benadryl warns that it is not to be given to infants without a doctor's prescription. Because

3

of the danger involved, federal regulations require that over-the-counter diphenhydramine include required warnings such as a warning not to use for a child under the age of two.

¶ 11. The level of diphenhydramine in H.B.'s blood was 670 nanograms per milliliter (ng/ml). A single, oral therapeutic dose of liquid diphenhydramine results in an average peak blood concentration of 81.8 ng/ml. There was also diphenhydramine in H.B.'s stomach and urine. The medical examiner explained that "the presence of diphenhydramine in [H.B.'s] stomach" shows that it "was taken by mouth" and that "it hadn't all been absorbed" at the time of her death. The medical examiner could not say how much or when exactly diphenhydramine was administered, but she opined that at least one administration must have been shortly before H.B.'s death because "it hadn't been all digested" which would take "up to a few hours."

¶ 12. H.B. had not been prescribed diphenhydramine. Her mother, father, grandparents, and other regular caretakers all testified that they never gave H.B. any medication containing diphenhydramine. Every person who cared for H.B. near the time of her death, including defendant, denied giving her any medicine containing the drug.

¶ 13. Following the close of the State's presentation at trial, defendant moved for judgment of acquittal on all counts under Vermont Rule of Criminal Procedure 29. Defendant argued that the State failed to introduce any evidence explaining how the diphenhydramine was administered to H.B. and any evidence showing that the administration of the drug involved a gross deviation from the standard of care that a reasonable person would have exercised in the same situation. She further argued that the State put forth no evidence that she acted "willfully" to "cause the child unnecessary suffering or to endanger the child's health." The trial court denied her motion.

¶ 14. After four hours of deliberation, the jury unanimously returned with a guilty verdict on both charges. Defendant renewed her arguments for a judgment of acquittal and the trial court again denied the motion.

4

¶ 15. On appeal, defendant asserts that the trial court made several errors. Defendant challenges the trial court's denial of her motion for judgment of acquittal for both convictions and argues that the State did not put forth sufficient evidence to convict her of either involuntary manslaughter or cruelty to a child with death resulting. She further contends that her two convictions were inconsistent, or in the alternative, violate double jeopardy. Finally, she argues that the admission of video evidence was unduly prejudicial. We consider each of her arguments in turn.

## I. Judgment of Acquittal

¶ 16. We review the denial of a motion for judgment of acquittal de novo, using the same standard as the trial court. State v. Hale, 2021 VT 18, ¶ 8, 214 Vt. 296, 256 A.3d 595. In doing so, we determine "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." State v. Perez, 2006 VT 53, ¶ 19, 180 Vt. 388, 912 A.2d 944 (quotation omitted). The same test applies for a challenge to the sufficiency of the evidence to support a conviction. State v. Tenney, 143 Vt. 213, 216, 464 A.2d 747, 748 (1983).

¶ 17. We may "grant a judgment of acquittal only when there is no evidence to support a guilty verdict." State v. Davis, 2018 VT 33, ¶ 14, 207 Vt. 346, 186 A.3d 1088 (quotation omitted). We "are not triers of fact, and we will not substitute our judgment for that of the jury." Hale, 2021 VT 18, ¶ 8 (quotation omitted). Though the evidence may be amenable to multiple interpretations, not all of which point towards guilt, "it is not our role to second-guess the interpretations of the jury." State v. Robitille, 2019 VT 36, ¶ 34, 210 Vt. 202, 213 A.3d 437. "Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence." State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988). Juries may draw reasonable inferences

5

from circumstantial evidence but may not "bridge evidentiary gaps with speculation." State v. Jones, 2019 VT 3, ¶ 13, 209 Vt. 370, 206 A.3d 153 (quotation omitted).

¶ 18.    Because defendant challenges the trial court's denial of her motion for judgment of acquittal on the grounds that the State did not put forth sufficient evidence to sustain her convictions, we look to each conviction in turn.

## A.  Involuntary Manslaughter

¶ 19.    Involuntary manslaughter is an "unlawful killing of another . . . with no intent to take human life . . . where the person acts with criminal negligence by failing to perceive a risk of death or serious bodily injury." State v. Viens, 2009 VT 64, ¶¶ 20-21, 186 Vt. 138, 978 A.2d 37. Criminal negligence occurs when a defendant "should be aware that a substantial and unjustifiable risk exists or will result from [her] conduct." State v. Brooks, 163 Vt. 245, 251, 659 A.2d 22, 26 (1995).  It requires a " 'gross deviation from the standard of care that a reasonable person would observe in the [defendant's] situation.' " Viens, 2009 VT 64, ¶ 17 (emphasis omitted) (quoting State v. Stanislaw, 153 Vt. 517, 525, 573 A.2d 286, 291 (1990)).

¶ 20.    Defendant challenges the sufficiency of the evidence offered to establish both causation and criminal negligence.

### i.  Causation

¶ 21.    Defendant argues on appeal that the State's evidence was insufficient to show causation—that is, that diphenhydramine intoxication caused H.B.'s death.  We decline to consider defendant's argument.  In her post-trial motion for judgment of acquittal, she conceded that "the State presented evidence from which" causation could be proven and argued exclusively that the State was unable to prove that defendant "acted with criminal negligence."  Given that concession, we will not consider this claim of error.  State v. Jackson, 2008 VT 71, ¶ 21, 184 Vt. 173, 956 A.2d 1126 (declining to consider defendant's challenge to sufficiency of evidence for element of crime conceded before trial court).

6

## ii. Criminal Negligence

¶ 22. Defendant also contends that the State's evidence was insufficient to establish proof of criminal negligence. Criminal negligence requires that defendant "should [have been] aware that a substantial and unjustifiable risk exists or will result from [her] conduct." Brooks, 163 Vt. at 251, 659 A.2d at 26. According to defendant, no evidence established anything about the "circumstances of [H.B.'s] diphenhydramine ingestion," and so only speculation could support the jury's finding that defendant acted with criminal negligence.

¶ 23. We disagree. Viewing the evidence in the light most favorable to the State and excluding modifying evidence, the following facts regarding defendant's state of mind were presented to the jury. Defendant was an experienced childcare provider, with over twenty-five years of experience in running her home daycare. Diphenhydramine intoxication caused H.B.'s death. At least one dose of diphenhydramine was administered to H.B. shortly before her death. Over-the-counter diphenhydramine includes required language on the package warning against use for children under the age of two. H.B. was unable to open or access medication on her own. Defendant was the only person present who could have administered diphenhydramine to H.B. in the relevant time frame. The concentration of diphenhydramine in H.B.'s blood was approximately eight times that of the concentration after a standard therapeutic dose in children.

¶ 24. Assessed under the applicable standard, this evidence shows that defendant administered diphenhydramine to H.B. in some unknown amount. Because she was an experienced childcare provider and over-the-counter diphenhydramine warns against use for children under the age of two, the jury could reasonably infer beyond a reasonable doubt that defendant "should [have been] aware that a substantial and unjustifiable risk exists or will result from [her] conduct." Brooks, 163 Vt. at 251, 659 A.2d at 26.

¶ 25. Defendant argues that this evidence is like that in State v. Durenleau, and therefore insufficient to sustain her conviction. 163 Vt. 8, 14, 652 A.2d 981, 984 (1994). In Durenleau, this

7

Court reversed a jury verdict of first-degree murder because it "resulted from jury conjecture and speculation supplementing a meager evidentiary record of defendant's involvement in her husband's death." Id. at 14, 652 A.2d at 984. At trial, the State proceeded on the theory that the defendant "aided or incited her lover" to kill her husband. Id. at 10, 652 A.2d at 982. Reviewing the evidence in the light most favorable to the State, we explained that the defendant had an affair with her lover, that she threatened to start sleeping with her husband again unless the lover "proved himself," that she planned a trip with her husband to the tavern where he was killed, that the defendant did not immediately report the murder scene, that the defendant and her lover were in regular contact after the killing, and that the lover told the defendant that he had "proven himself." Id. at 13, 652 A.2d at 983-84. From that record, we concluded that the evidence offered did "not permit rational inferences sufficient to establish guilt beyond a reasonable doubt" that the defendant "aided or incited" the lover in that killing. Id. at 10, 14, 652 A.2d at 982, 984. Because the State presented no evidence that the lover had "proven himself through means dictated by defendant," we reversed the defendant's conviction. Id. at 13, 652 A.2d at 984 (emphasis added).

¶ 26.    This situation is not like Durenleau. In Durenleau, the State had to put forth evidence to show that the defendant had "dictated" the means of the killing of her husband and failed to do so. Id. Here, the State need only show that defendant "should [have been] aware that a substantial and unjustifiable risk exists or will result from [her] conduct." Brooks, 163 Vt. at 251, 659 A.2d at 26. The warning labels on over-the-counter diphenhydramine and defendant's years of experience caring for infants and children is sufficient evidence that she should have been aware of the risks of dosing children with this drug.

¶ 27.    This situation is essentially identical to that of State v. Robitille, 2019 VT 36. In Robitille, we affirmed the defendant's conviction for involuntary manslaughter of her disabled son over the defendant's claim that the State failed to put forth sufficient evidence of both causation and criminal negligence. 2019 VT 36, ¶¶ 36-40. The evidence showed that the defendant gave

8

her son "at least one ounce of vodka and that she had additional opportunities to administer more alcohol to him." Id. ¶¶ 36-37. Though his doctors would not have expected one ounce to kill him, "the risk would increase with the amount." Id. ¶ 37. On the causation challenge, we concluded that "[b]ased on this evidence, the jury could reasonably infer beyond a reasonable doubt that [the] defendant gave [her son] more than one ounce of alcohol" and caused his death. Id. Other evidence established that the defendant was intimately involved in her son's care and knew the dangers posed by dehydration. Id. ¶ 40. Accordingly, we concluded that the evidence was sufficient for the jury to infer that the defendant acted with criminal negligence. Id.

¶ 28. So too here. The evidence is sufficient to show that defendant administered some amount of diphenhydramine to H.B., leading to a concentration of the drug in her blood in amounts many times greater than a therapeutic dose. A jury could reasonably conclude that such an administration, for an experienced childcare provider, rises to the level of criminal negligence. Accordingly, there was sufficient evidence for a jury to convict defendant of involuntary manslaughter.

## B. Cruelty to a Child, Death Resulting

¶ 29. A person is guilty of criminal cruelty to a child when she, being "over 16 years of age, having the custody, charge, or care of a child, who willfully . . . exposes such child . . . in a manner to cause such child unnecessary suffering, or to endanger . . . her health." 13 V.S.A. § 1304(a). The statute provides for additional penalties "[i]f the child suffers death." Id. § 1304(b)(1). To establish guilt, the State must show that defendant willfully—consciously and purposefully—caused H.B. to be "exposed to conditions that she knows endanger [H.B.'s] health." State v. Amsden, 2013 VT 51, ¶ 34, 194 Vt. 128, 75 A.3d 612. The defendant must willfully do the action that "expose[s] . . . a child in a manner that endangers that child," but must only have "knowledge of those dangerous conditions." Id. The statute does not criminalize only acts "the conscious object of which are to endanger or harm a child." Id.

9

¶ 30.	Defendant challenges the sufficiency of the evidence of her intent. The evidence, in the light most favorable to the State and excluding any modifying evidence, shows the following. Perez, 2006 VT 53, ¶ 19. H.B. was more tired than normal after being picked up from defendant's daycare the day before she died. She napped for longer than normal and did not sleep at all that night. H.B. would only nap in someone's arms, as she would wake up if placed into her crib or swing. Defendant testified that, on the day H.B. died, defendant fed H.B. her second bottle for the day and put her down for a nap in her crib. Defendant found H.B. unresponsive in that crib later that afternoon. From this evidence, the jury could properly infer that defendant intentionally administered diphenhydramine to H.B.

¶ 31.	Defendant was an experienced daycare provider. Prior to January 2019, she knew what diphenhydramine was. Diphenhydramine is available as Benadryl or Children's Benadryl. The instruction labels on Benadryl warns that it is not to be given to infants without a doctor's prescription. Over-the-counter diphenhydramine warns against use for a child under the age of two. A jury could thus properly conclude that giving any dose of diphenhydramine to an infant without a prescription exposed that infant to a risk of harm.

¶ 32.	Thus, the only remaining inquiry is whether the jury could infer that defendant knew that giving H.B. diphenhydramine exposed her to danger. We have previously discussed what is required to show willful exposure to danger in State v. Amsden, 2013 VT 51, ¶¶ 26-36. In Amsden, the defendant brought her four-year-old son to an area under a bridge where the ground was "littered with trash, glass, urine, and feces" and then ignored him, barefoot and wearing only soiled shorts, while she engaged in a sexual act with a man nearby. Id. ¶ 2 (alteration omitted). We agreed that the evidence showed that the bridge area was "by any observable standard dangerous and unhealthy for any child." Id. ¶ 28. The defendant bringing her son to the bridge and then ignoring him endangered him within the meaning of 13 V.S.A. § 1304. Id. ¶ 31. We concluded there was ample evidence that the "defendant was subjectively aware of the hazards

10

present" because "the conditions were apparent and obvious to anyone" and there was no suggestion that the defendant accidentally brought her son to a dangerous area. Id. ¶ 35. The defendant's subjective awareness of the dangerous conditions required us to affirm her conviction for cruelty to a child.

¶ 33. Like in Amsden, we conclude that there was evidence to support the jury's conclusion that defendant was "subjectively aware of the hazards" present in administering diphenhydramine to an infant without a prescription. Id. ¶ 35. Though the dangerous conditions of administering diphenhydramine may not be so obvious that the conditions would be "apparent and obvious to anyone," id., the jury heard that defendant had many years of childcare experience, that she knew what diphenhydramine was prior to the events at issue here, and that federal regulations require that all over-the-counter diphenhydramine includes a warning not to use for a child under the age of two.

¶ 34. Our inquiry here is whether the jury "could conclude beyond a reasonable doubt that defendant committed the acts for which she was charged." Robitille, 2019 VT 36, ¶ 33 (alteration and quotation omitted). We may only find that the evidence was insufficient to support the jury's guilty verdict if there is no evidence to support it. Davis, 2018 VT 33, ¶ 14. We conclude that the evidence presented suffices to establish that defendant knew of the risks to H.B in administering her diphenhydramine. Accordingly, there was sufficient evidence for a jury to convict defendant of cruelty to a child with death resulting.

## II. Inconsistent Verdicts

¶ 35. Defendant argues that her guilty verdicts are inconsistent because a "guilty verdict on one count negatives some fact essential to finding a guilty verdict" on the second count. United States v. Daigle, 149 F. Supp. 409, 414 (D.D.C. 1957). The thrust of her argument is that the mental states for the two different crimes are mutually exclusive, so the jury could not logically convict her of both. She argues that the State cannot show both that she acted intentionally and

with knowledge of the risk of "exposing" H.B. to diphenhydramine—to sustain the cruelty charge—and that she disregarded a risk of death or injury such that her failure to perceive it involves a gross deviation from the standard of care a reasonable person would observe—to sustain the manslaughter charge. Defendant argues that we "should not thus permit the jailing of accused persons on a record exhibiting verdicts in which a jury simultaneously says 'yes' and 'no' in answer to a single critical question." United States v. Vastine, 363 F.2d 853, 855 (3d Cir. 1966) (Hastie, J., concurring).

¶ 36. But these charges do not have mutually exclusive mental states. As the Connecticut Supreme Court has explained, "there is no reason why a person cannot simultaneously act intentionally and recklessly with respect to the same conduct and the same victim if each of those mental states pertains to a different result." State v. Nash, 114 A.3d 128, 138 (Conn. 2015) (alteration omitted). The Court continued:

> For example, if A shoots B in the arm intending only to injure B, A nevertheless may recklessly expose B to a risk of death if A's conduct also gave rise to an unreasonable risk that the bullet would strike B in the chest and thereby kill him. In such circumstances, a jury could find both that A intended to injure B and, in doing so, recklessly created an undue risk of B's death.

Id. at 138 n.15. This case presents precisely such a situation. The jury found that: (1) defendant willfully administered diphenhydramine to H.B.; (2) she knew that doing so exposed H.B. to some risk to her health; (3) her actions gave rise to an unreasonable risk of death; and (4) defendant should have and failed to appreciate that risk. None of these findings negates any other, and as noted above, the evidence introduced at trial was sufficient to sustain them.

¶ 37. This is not a case like State v. Crepeault, 167 Vt. 209, 214, 704 A.2d 778, 782 (1997), where we reversed a conviction for aggravated sexual assault after the jury acquitted on three predicate charges. In Crepeault, the State charged the defendant with four counts of sexual assault: three charges stemmed from specific sexual acts and the fourth charge alleged a "general

12

sexual assault upon a victim under ten." Id. at 211-12, 704 A.2d at 780. The fourth charge, the general charge of aggravated sexual assault, "was based . . . upon the assumption that [the] defendant might be convicted of one or more of the sexual acts alleged in the first three counts" and was "included solely to carry the additional serious-bodily-injury enhancement" of the fourth count. Id. at 212, 704 A.2d at 781. Because the jury acquitted the defendant for the sexual acts charged in the first three counts, we explained that the guilty verdict on the fourth count was inconsistent with the acquittals and must be reversed because the conviction must have been "rendered not on the . . . evidence actually presented, but on a general feeling that [the] defendant must have been guilty of some wrongdoing." Id. at 213, 704 A.2d at 781.

¶ 38. In Crepeault, the fourth charge was predicated on the first three charges. Here, the two charges stand independently. Defendant argues that the jury here must have, like Crepeault, "assumed that something bad must have happened, and thus compromised by convicting the defendant of something." That is not the situation here. As discussed above, the evidence presented to the jury was sufficient to sustain the defendant's convictions on both charges.

### III. Double Jeopardy

¶ 39. In the alternative to her arguments that the verdicts are inconsistent, defendant challenges the convictions for both crimes as violating double jeopardy. She argues that both crimes penalize her for the same action of giving diphenhydramine to H.B. She failed to acknowledge in her opening brief that this challenge was not preserved and raised a plain-error argument for the first time in her reply brief. Even if we consider her argument under a plain-error analysis, defendant's double jeopardy challenge fails. "We will find plain error only in those rare and extraordinary cases where the error is both obvious and strikes at the very heart of the defendant's constitutional rights or results in a miscarriage of justice if we do not recognize it." State v. Campbell, 146 Vt. 25, 27, 497 A.2d 375, 377 (1985).

13

¶ 40. The Double Jeopardy Clause in the Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend V. The Clause protects a criminal defendant "from facing multiple punishments for the same offense." State v. Hovey, 2021 VT 64, ¶ 12, 215 Vt. 327, 263 A.3d 760 (quotation omitted). However, because the Legislature is empowered to define offenses and punishments, the Clause " 'is best understood as limited to assuring that the court does not exceed its legislative authorization.' " Id. (quoting State v. Breed, 2015 VT 43, ¶ 16, 198 Vt. 574, 117 A.3d 829).

¶ 41. Thus, our primary inquiry for double jeopardy challenges is of legislative intent. State v. Fonseca-Cintron, 2019 VT 80, ¶ 21, 213 Vt. 11, 238 A.3d 594. If the Legislature clearly "meant to impose multiple punishments for the same conduct under different statutes, then we rely on that clear expression of intent." Id. (quotation omitted).

¶ 42. Here, the cruelty-to-a-child statute provides that the "provisions of this section do not limit or restrict the prosecution for other offenses arising out of the same conduct." 13 V.S.A. § 1304(c). The Legislature patently intended for criminal defendants to face multiple punishments for the same conduct, so defendant's conviction on both charges does not violate the Double Jeopardy Clause. Fonseca-Cintron, 2019 VT 80, ¶ 21. At oral argument, defendant argued for the first time that this provision, which further explains that the cruelty-to-a-child statute shall not "limit or restrict defenses available under common law," means that the statute did not intend to bar a defendant's double-jeopardy challenge. 13 V.S.A. § 1304(c). This provision solely empowers defendants to raise defenses to the additional charges; it does not modify the statutory empowerment of multiple charges for the same conduct. We see no error here, much less plain error.

## IV.  Admission of Video Evidence

¶ 43.  Defendant finally contends that the trial court committed reversible error by admitting videos that defendant argues were unduly prejudicial.  The State introduced two videos of H.B., totaling approximately thirteen seconds of footage, during H.B.'s mother's testimony.  In the first video, H.B. is making baby noises and partially holding herself up.  In the second video, played for the jury without sound, H.B. is laying down and holding a bottle up to her mouth.  Defendant argues that, because other evidence established that H.B. was a healthy baby and could hold a bottle, the videos were unfairly prejudicial and should have been excluded under Vermont Rule of Evidence 403.  See V.R.E. 403 (providing that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

¶ 44.  The parties dispute whether this argument was properly preserved.  After defendant filed a motion in limine to exclude these videos, the trial court made a preliminary ruling on the first day of trial that the two videos were relevant to the State's case in eliminating other causes of death and were not unduly prejudicial.  After counsel and the court continued discussing other matters, the State informed the court that the videos would be offered that day and asked the court to review the videos again before opening arguments.  Defense counsel did not object again at that time, nor did he object when the State introduced the videos as part of H.B.'s mother's testimony.

¶ 45.  Vermont Rule of Evidence 103 provides that a party need not renew an objection "once the court makes a definitive ruling on the record admitting . . . evidence" to "preserve a claim of error for appeal."  The record is somewhat unclear as to whether the court's "tentative ruling" became final upon the court's review of the videos and discussion with counsel mere moments later.

¶ 46.  Even if the argument was properly preserved, we nevertheless conclude that the trial court did not abuse its discretion in admitting the videos.  "We apply a deferential standard of review to a trial court's evidentiary rulings."  State v. Noyes, 2021 VT 50, ¶ 32, 215 Vt. 182, 260

15

A.3d 1132. We "will reverse its decision only where there has been an abuse of discretion that resulted in prejudice." State v. Russell, 2011 VT 36, ¶ 6, 189 Vt. 632, 22 A.3d 455 (mem.) (quotation omitted). The trial court only abuses its discretion if the court "either totally withholds or exercises its discretion on clearly untenable or unreasonable grounds." State v. Lee, 2005 VT 99, ¶ 11, 178 Vt. 420, 886 A.2d 378 (quotation omitted). The court's ruling on the admission of evidence under Rule 403 "will be upheld where there is 'some indication—especially in cases like this one where the potential for unfair prejudice is high—that the court actually engaged in the balancing test and exercised its discretion.' " State v. Longley, 2007 VT 101, ¶ 18, 182 Vt. 452, 939 A.2d 1028 (quoting State v. Shippee, 2003 VT 106, ¶ 14, 176 Vt. 542, 839 A.2d 566 (mem.)).

¶ 47. Here, the State argued that it had to prove causation, so videos showing H.B.'s developmental capacity were relevant because they demonstrated that she did not have the capacity to either give herself medicine or protect herself from harm. The trial court considered the arguments and balanced the State's interest in showing the videos to establish causation and the defendant's interest in not having unduly prejudicial material shown to the jury. The court explained that defendant contested whether the State could establish causation, so H.B.'s abilities were relevant to "eliminating other causes of death other than the diphenhydramine." The court disallowed the State from showing an additional video, very similar to the first video, as cumulative. The court further limited what the State could present by excluding the sound from the second video presented to the jury. The record amply demonstrates that the court "engaged in the balancing test and exercised its discretion." Longley, 2007 VT 101, ¶ 18 (quotation omitted).

¶ 48. The trial court did not abuse its discretion here. Evidence is unfairly prejudicial if "its primary purpose or effect is to appeal to the jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or cause other reactions that would result in the jury basing its decision on something other than the established propositions of the case." State v. Caballero, 2022 VT 25, ¶ 39, 216 Vt. 406, 279 A.3d 676 (quotation omitted). As the trial court noted,

16

"sympathy is going to be there just based upon the nature of the case." See id. ¶ 41 (explaining that undue prejudice must be judged with respect to other evidence admitted and nature of case).

¶ 49. The videos demonstrating H.B.'s physical capacity supported the State's arguments at trial that H.B. could not have given herself the diphenhydramine that killed her. Defendant argues that she was not contesting H.B.'s inability to give herself the drug so the video evidence was not relevant. We disagree. As the trial court explained, the defendant argued that the State could not prove, "specifically, the cause of death of the child," so the videos showing the child's developmental capacity were relevant to show H.B.'s capacity to administer the drug or protect herself from harm. Any emotional response generated in the jurors from the videos does not substantially outweigh the probative value of the videos. The trial court did not allow the few seconds of video footage on "clearly untenable or unreasonable grounds" so we must affirm its exercise of discretion. Lee, 2005 VT 99, ¶ 11 (quotation omitted).

V. Conclusion

¶ 50. Defendant has not identified any grounds to disturb the jury's verdict. First, there was sufficient evidence presented for the jury to convict defendant for both involuntary manslaughter and cruelty to a child with death resulting. Second, the verdicts against her are not inconsistent and do not violate double-jeopardy. Finally, the trial court did not abuse its discretion by allowing in the short videos of H.B.

Affirmed.

FOR THE COURT:

_____

Associate Justice

17