2009 VT 64

## State of Vermont v. Collin Viens

[978 A.2d 37]

No. 07-444

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed June 19, 2009

---

*James A. Hughes*, Franklin County State's Attorney, St. Albans, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Daniel Stevens*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

¶ 1. **Johnson, J.** After he shot and killed Rejean Lussier while hunting, defendant Collin Viens was charged, convicted, and sentenced for involuntary manslaughter. 13 V.S.A. § 2304. On appeal, defendant claims that the trial court erred in instructing the jury and in denying defendant's motions for a judgment of acquittal. Defendant also asserts that his conviction cannot stand because the State's information was defective. We disagree and affirm.

¶ 2. The record, viewed in the light most favorable to the verdict, reveals the following facts. On November 23, 2005, defendant, a college freshman, went hunting with his friends. Defendant had not hunted before, but he had successfully obtained his hunting license through an accelerated hunter education course that summer. The accelerated course consisted of a home study program and a day of training with a certified instructor. The course included instruction on hunter safety, and it emphasized, among other safety guidelines, that a hunter should use binoculars instead of his rifle scope for viewing objects, aim his firearm at a target only if he intended to shoot it, keep his rifle's safety engaged and finger off of the trigger until ready to fire, and exercise proper muzzle control at all times. Testimony at trial indicated that hunters sometimes violate these guidelines; however, they are generally considered fundamental to safe hunting.

¶ 3. During the hunt, defendant's friends "pushed" the woods, attempting to drive deer into an adjacent field where defendant, acting as the "sitter," waited to fire at any deer driven toward him. It was getting dark, with about an hour left of light, when

defendant's friends heard two gun shots. When the group exited the woods and joined defendant, he explained that he had shot at a coyote. The group then disbanded, and defendant returned home.

¶ 4. That evening, the victim was found dead sitting in a tractor on his farm, near where the group had been hunting. Testimony at trial indicated that the victim occasionally observed deer from his unlit, stationary tractor.

¶ 5. At the crime scene, investigators discovered boot tracks in the snow approximately two hundred yards from the tractor. The tracks were in a "very small circle" and looked like "somebody [was] being impatient." Two rifle cartridge casings and a penny-sized medallion were found near the tracks.

¶ 6. The following morning, defendant received a phone call notifying him of the victim's death. He returned to the hunting site with his father to speak with the police. Defendant cooperated with the police and led them to where he had been hunting the day before — the exact spot where police discovered the casings and the medallion.[1] Defendant told the police that he had fired his rifle at a coyote that had run between him and the tractor.

¶ 7. During his second formal interview with the police, however, defendant admitted that he had not seen a coyote. According to his taped statement, which was played at trial, defendant was kneeling on the ground and "messing around" with his rifle while waiting for his friends to flush deer towards him. At some point, he stood up, shouldered his gun — with the safety off and his finger on the trigger — and began to point it in different directions while looking through the scope. Defendant stressed that he did not intentionally fire at the tractor; the rifle just "went off." Because he was embarrassed and did not want his friends to think less of him, defendant fired another shot into the woods and fabricated the coyote story to disguise the accidental discharge. Defendant ultimately admitted that he was looking through his rifle's scope and had seen the tractor at the time his rifle discharged.

¶ 8. At trial, the State argued that defendant's conduct was criminally negligent. According to the defense, the victim's death was a tragic accident, not a crime. The jury returned a unanimous

---

[1] Subsequent expert testimony confirmed that the medallion came from defendant's rifle and that the casings bore markings consistent with being fired from his gun.

verdict, convicting defendant of involuntary manslaughter due to his criminal negligence. This appeal followed.

## I.

¶ 9. On appeal, defendant contends that the trial court erroneously instructed the jury. First, according to defendant, the court failed to describe an element of the crime — the existence of an unlawful act independent of the killing of the victim. Second, defendant argues, the court erroneously neglected to instruct the jury regarding a specific set of acts sufficient to support the State's assertion that defendant acted with criminal negligence; therefore, defendant insists, there can be no way of knowing that the jury reached a unanimous decision with respect to that element of the charged crime, as required.

¶ 10. We review assertions of error with respect to jury instructions differently depending on whether the claimed error was adequately preserved for appeal. Where the defendant has made a timely, substantive objection to an allegedly deficient instruction after the charge and before the jury retires, we assess whether, viewing the instructions "in their entirety," they provided sufficient guidance to the jury without introducing prejudice into their deliberations. *State v. Martin*, 2007 VT 96, ¶ 39, 182 Vt. 377, 944 A.2d 867. The instructions need not be perfect; however, they must reflect "the true spirit of the law, such that the jury has not been misled." *Id.* (quotation omitted). A reversal is not called for unless the court's instructions, viewed in this light, "undermine[] confidence in the jury's verdict." *Id.*

¶ 11. Conversely, where the defendant does not make a timely objection below and thereby fails to preserve the issue for appeal, our review is substantially more circumscribed. We assess the instruction in the context of the entirety of the instructions according to a plain error standard. *In re Carter*, 2004 VT 21, ¶ 21, 176 Vt. 322, 848 A.2d 281. Plain error exists only where "a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *Id.* (quotation omitted). Additionally, absent a showing of "an unfair prejudicial impact on the jury's deliberations," we will not find plain error. *State v. Pelican*, 160 Vt. 536, 538-39, 632 A.2d 24, 26 (1993) (quotation omitted).

## A.

¶ 12. Turning to defendant's first claim of error regarding the jury instructions, we note, at the outset, that defendant properly preserved this claim for our review. After the judge read the instructions to the jury, but before the jury retired for deliberations, defendant's counsel objected to the court's failure to describe the crime of involuntary manslaughter to the jury as requiring an independent unlawful act.

¶ 13. We have looked to the common law to supply the elements of the crime of involuntary manslaughter because our manslaughter statute, 13 V.S.A. § 2304, does not define the offense.[2] See *State v. Shabazz*, 169 Vt. 448, 450, 739 A.2d 666, 667-68 (1999). Over time, our view of the common law of manslaughter has changed.

¶ 14. In an early case involving a brawl wherein one of the participants was killed, *State v. McDonnell*, we described manslaughter as follows:

> Manslaughter is the unlawful killing of another, without malice, and may be either voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion occasioned by some great provocation, which in tenderness for the frailty of human nature the law considers sufficient to palliate the offen[s]e; or involuntary, as when the death of another is caused by some unlawful act, not accompanied with any intention to take life.

32 Vt. 491, 545 (1860) (quotation and emphasis omitted), *overruled on other grounds by State v. Burpee*, 65 Vt. 1, 36, 25 A. 964, 974 (1892). Subsequent cases exhibited substantial flexibility regarding the conduct that could be deemed unlawful for purposes of involuntary manslaughter. For example, in *State v. Center*, we concluded that "indecent and immoral" conduct, though not criminal, could be unlawful. 35 Vt. 378, 386 (1862). Additionally, in *State v. Averill*, a case involving a purportedly accidental shooting, we held that "[a] lawful act done in an unlawful or negligent manner is in law an unlawful act." 85 Vt. 115, 126, 81 A. 461, 464-65 (1911)

---

[2] Section 2304 provides: " [a] person who commits manslaughter shall be fined not more than $3,000.00, or imprisoned for not less than one year nor more than 15 years, or both."

(quotation omitted). Thus, in *Averill*, where the defendant was indicted for murder, we upheld the trial court's decision to charge the jury on the lesser included offense of involuntary manslaughter because the facts indicated that defendant's negligent handling of the gun caused the victim's death. *Id.* at 133, 81 A. at 467.

¶ 15. Later cases continued to recite the unlawful act formulation of involuntary manslaughter stemming from *McDonnell*, see, e.g., *State v. Rounds*, 104 Vt. 442, 452, 160 A. 249, 252 (1932); *In re Estate of Mahoney*, 126 Vt. 31, 35, 220 A.2d 475, 478 (1966); *State v. Norton*, 147 Vt. 223, 233, 514 A.2d 1053, 1060 (1986); *State v. Forbes*, 147 Vt. 612, 617, 523 A.2d 1232, 1235 (1987), and added minor regulatory infractions and statutory crimes to the growing list of acts considered sufficiently unlawful for purposes of attaching criminal liability when their commission unintentionally resulted in death of another, see *State v. Poirier*, 142 Vt. 595, 598, 458 A.2d 1109, 1111 (1983) (upholding conviction of involuntary manslaughter stemming from car accident where unlawful acts included disregarding no-passing sign, driving illegally "in the lane of oncoming traffic," and "driving while under the influence"). Additionally, in *State v. Valley*, we held that an omission or failure to act in derogation of an affirmative duty to do so could be considered an unlawful act for purposes of involuntary manslaughter. 153 Vt. 380, 390, 571 A.2d 579, 584 (1989).

¶ 16. The common thread running through the foregoing cases is this; upon characterizing a defendant's act as unlawful, and determining that it caused the victim's death, the defendant could be found guilty of involuntary manslaughter. These cases approached the crime of involuntary manslaughter as one of strict liability. See *State v. Stanislaw*, 153 Vt. 517, 522, 573 A.2d 286, 290 (1990) (observing that "our common law precedents" do not specify what intent is required, if any, with respect to the crime of involuntary manslaughter).

■ ¶ 17. We rejected the strict liability approach to involuntary manslaughter in *Stanislaw*.[3] 153 Vt. at 523-24, 573 A.2d at 290.

---

[3] *Stanislaw* involved an interlocutory appeal by a defendant charged with involuntary manslaughter for causing "the death of the victim by committing the unlawful act of furnishing alcohol to a minor." 153 Vt. at 525-26, 573 A.2d at 291. The appeal specifically required us to answer whether "the information and affidavit of probable cause, alleging the strict liability crime of illegal act involuntary manslaughter (providing liquor to a minor with the death of the minor resulting) [was]

We held instead that the crime required the minimum culpability level of criminal negligence, which we defined as follows:

> Defendant must have disregarded a risk of death or injury of such a nature and degree that [his] failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a *gross deviation* from the standard of care that a reasonable person would observe in the actor's situation.

*Id.* at 525, 573 A.2d at 291 (quotation omitted). Having rejected a strict liability approach to the crime, it follows that *Stanislaw* eliminated an independent unlawful act as an element of involuntary manslaughter. Post-*Stanislaw*, it is unnecessary to consider whether an act is independently unlawful; instead, *any* act undertaken by a defendant in a criminally negligent fashion that results in the death of another may subject the defendant to criminal liability for involuntary manslaughter. See *State v. Wheelock*, 158 Vt. 302, 310, 609 A.2d 972, 977 (1992) (citing *Stanislaw* for the proposition that "[i]nvoluntary manslaughter is the killing of another human being as a result of criminal negligence" (emphasis omitted)).

■ ¶ 18. Pursuant to defendant's view of the elements of the crime, a person causing the death of another cannot be convicted of involuntary manslaughter unless they acted with criminal negligence in engaging in conduct that is also independently unlawful. Defendant urges us to, in effect, combine elements of unlawful-act involuntary manslaughter with criminal-negligence involuntary manslaughter. We decline defendant's request to combine two conceptually distinct formulations of the crime. See 2 W. LaFave, Substantive Criminal Law § 15.4, at 520 (2d ed. 2003) ("Involuntary manslaughter . . . may be divided into two separate types . . . which may be labeled (1) 'criminal-negligence' manslaughter and (2) 'unlawful-act' manslaughter."); see also *id.* § 15.5, at 530 ("The trend today is to abolish [unlawful-act] manslaughter, leaving the field of involuntary manslaughter occupied only by the

---

legally valid in Vermont?" *Id.* at 521, 573 A.2d at 289. Notwithstanding the fact that we concluded that "[i]llegal act involuntary manslaughter does not constitute a strict liability crime," *id.* at 527, 573 A.2d at 292, we ruled that the information and affidavit of probable cause, when considered together, "adequately apprised defendant of the cause and nature of the accusation against him," *id.* at 526, 573 A.2d at 291.

criminal-negligence type . . . ."). In the context of involuntary manslaughter, a defendant's criminal liability does not hinge on whether his otherwise blameworthy act can be described as violating a common law or statutory offense.

¶ 19. Defendant correctly observes that post-*Stanislaw* we have addressed involuntary manslaughter convictions that involved independently unlawful acts, see *State v. Daley*, 2006 VT 5, ¶ 5, 179 Vt. 589, 892 A.2d 244 (mem.) (attempting to elude a police officer, among others); *State v. Brooks*, 163 Vt. 245, 250, 658 A.2d 22, 26 (1995) (reckless endangerment), and have seemingly reiterated the unlawful-act formulation of involuntary manslaughter previously enunciated in *McDonnell*, see *Shabazz*, 169 Vt. at 450-52, 739 A.2d at 667-69. First, the fact that we upheld an involuntary manslaughter conviction in *Brooks*, a case that happened to involve an independent unlawful act, does not mean that the act was required to sustain the conviction. Our analysis in *Brooks* focused on the trial court's instruction to the jury regarding mens rea. 163 Vt. at 250-51, 658 A.2d at 26-27. We upheld the conviction not because of the existence of an independent unlawful act, but because the trial court gave an appropriate mens rea instruction. *Id.* Second, the central issue in *Daley* concerned whether the trial court abused its sentencing discretion. 2006 VT 5, ¶¶ 6-7. In *Daley*, we merely observed that the defendant pled guilty to involuntary manslaughter after being charged with seven separate offenses stemming from his flight following a routine police stop that resulted in the death of a police officer. *Id.* ¶ 5. Thus, neither *Brooks* nor *Daley* stand for the proposition that an independent unlawful act is an element of involuntary manslaughter post-*Stanislaw*. Moreover, in *State v. Grace*, another post-*Stanislaw* case, we upheld the defendant's conviction for involuntary manslaughter where the evidence did not demonstrate an independently unlawful act but instead tended to show that the defendant "unintentionally caused her boyfriend's death and was criminally negligent in wielding [a] kitchen knife." 160 Vt. 623, 624, 649 A.2d 225, 226 (1993) (mem.). Finally, defendant reads our quotation of *McDonnell* in *Shabazz* out of context. After quoting *McDonnell*, we observed in *Shabazz* that *Stanislaw* required a minimum culpability level of criminal negligence for involuntary manslaughter instead of strict liability as contemplated by *McDonnell*. *Shabazz*, 169 Vt. at 450-52, 739 A.2d at 667-69. *Shabazz* cannot, therefore, be read as an endorsement of unlawful-act involuntary manslaughter.

¶ 20. Turning to the trial court's instructions to the jury in this case, we note that the court described involuntary manslaughter as follows:

> Involuntary manslaughter is an unlawful killing of another human being done with no intent to take human life. It is an unintentional killing where the person acts with criminal negligence by failing to perceive a risk of death or serious bodily injury.

The court then described the crime's elements:

> In this case the essential elements are that on the date and the place alleged: (1) Collin Viens; (2) [c]aused the death of [the victim]; (3) the killing was unlawful;[4] and (4) in causing the death of [the victim] the defendant acted with criminal negligence.

Regarding what it characterized as the fourth element of the crime, criminal negligence, the court stated:

> Criminal negligence means something more than ordinary carelessness. It means that the State must prove that the defendant acted unaware of the risk of death. It must be of such a nature and degree that his failure to perceive it considering the nature and purpose of his conduct and the circumstances known to him involved a gross deviation from the standard of care that a reasonable person would have observed . . . . A criminally negligent act is one that is so grossly contrary to common experience that it becomes intolerable to reasoning minds that the actor did not perceive the risk of harm created by his conduct. In determining the defendant's state of mind you should consider all of the surrounding facts and circumstances established by the evidence in this case.

---

[4] The court further elaborated on this element, stating, in part, that "[t]he term unlawful killing means without legal excuse or legal justification." The court appears to have viewed this element as one distinguishing mere accidents, for which no criminal liability attaches, from instances of criminally negligent conduct, which may subject an individual to criminal sanctions. We note that the State did not argue that this language required an independent unlawful act in answering defendant's claims on appeal. Nor has defendant agreed that the language satisfies the unlawful act element he seeks. Thus, we do not address this language other than to say that, if it had any effect, that effect would have been beneficial to defendant.

The court's formulation of the crime did not include defendant's proposed instruction that characterized "[t]he special elements of involuntary manslaughter" as consisting of "an unlawful act *combined* with criminal intent."

█ ¶ 21. We are not persuaded that the court's instruction failed to reflect "the true spirit of the law." *Martin*, 2007 VT 96, ¶ 39 (quotation omitted). Instead, we conclude quite the opposite; the court's instructions regarding the elements of involuntary manslaughter accurately characterized the state of our law. The trial court explained that the jury must find that defendant engaged in a level of conduct that met the criminal negligence standard and caused the victim's death. The trial court set forth a sufficient description of causation,[5] and, crucially, it accurately described criminal negligence, quoting nearly verbatim the definition set forth in *Stanislaw*. The jury was clearly instructed that they could not convict defendant if they found that he acted with "ordinary carelessness." Therefore, the decision of the court to refuse to require the jury to find an independent unlawful act in no way undermines our confidence in the verdict.

## B.

¶ 22. Defendant also asserts that the trial court's instructions were erroneous because they did not specify the act or acts the jury must find in order to convict defendant of involuntary manslaughter.[6] In the absence of a court-supplied theory of criminal negligence in the instructions, defendant insists that "it is

---

[5] Regarding causation, the trial court instructed the jury as follows:

> The second essential element is that [defendant] caused the death of [the victim]. The State must have proven that [defendant's] acts caused [the victim's] death in a natural and continuous sequence, unbroken by any efficient intervening cause. An efficient intervening cause would be an unexpected independent force that broke the connection between the defendant's acts and the victim's death.

> Before you can convict the defendant of this charge you must conclude that [the victim's] life ended by means other than natural causes, accident that was not the result of criminal negligence, or suicide. You must also conclude that but for [defendant's] acts [the victim's] death would not have occurred.

[6] More specifically, defendant claims that

> some jurors could have believed that [defendant] intentionally fired the rifle, and other jurors might have believed that the gun fired uninten-

unknown what acts the jury did find" and, more importantly, that the jury was not required to unanimously agree on the actus reus of the crime before convicting defendant. Defendant did not make a timely, substantive objection to the trial court's charge regarding juror unanimity; therefore, we conduct a limited, plain-error review, see *Carter*, 2004 VT 21, ¶ 21.

■ ¶ 23. Viewing the court's instructions as a whole, we cannot say that the court's instructions here were plain error. During the jury charge, the court summarized the State's theory of the case and emphasized that the State bore the burden of proving each element of the charged offense.[7] Subsequently, in addition to a general instruction on unanimity that clearly specified that the jurors must be unanimous as to each element of the crime, the trial court also gave a specific instruction regarding the possible existence of alternative theories of criminal negligence and the unanimity requirement. The court said:

> Evidence has been presented of different separate acts which could support a finding of criminal negligence. Before you can find [defendant] guilty of the crime charged you must all agree upon the facts which would support a decision that the State has proven each element of the offense beyond a reasonable doubt. You may not find [defendant] guilty of the crime charged unless all of you agree that the State has proven beyond a reasonable doubt that [defendant] committed particular acts which proved the essential elements of the charge.

tionally. Some jurors may have believed that [defendant] fired the gun intentionally but was not aiming at the tractor. Some jurors may have concluded that the pointing of the rifle with the safety off was a sufficient act. The possible factual permutations are numerous . . . .

[7] The court described the State's theory of the case thusly:

The State contends that the defendant fired his rifle at a tractor in which [the victim] was sitting and that the bullet he fired pierced the window of the tractor cab killing [the victim]. The State does not contend that [defendant] knew that [the victim] was sitting in the tractor. The State does not contend that [defendant] fired his rifle with the intention of killing [the victim]. The State contends that [defendant] should have known that someone might have been in the tractor and that he pointed his loaded rifle at the tractor without having the gun's safety lock in place. In so doing the State contends that [defendant] acted with criminal negligence.

In light of the court's general and specific instructions regarding juror unanimity that clearly required the jury to agree on a specific set of acts amounting to criminal negligence, we cannot say that the court committed error, let alone plain error. Cf. *State v. Verge*, 152 Vt. 93, 97-98, 564 A.2d 1353, 1355-56 (1989) (rejecting claim of plain error where court gave general unanimity instruction, and the defendant did not request special verdict).

¶ 24. This case is distinguishable from *State v. Couture*, 146 Vt. 268, 502 A.2d 846 (1985), on which defendant relies.[8] In *Couture*, we faced a situation where the court's instructions allowed a conviction under a variety of factual scenarios, without an instruction on unanimity, and concluded that this was plain error. *Id.* at 272, 502 A.2d at 849. Here, the court's unanimity instructions explicitly required the jurors to settle upon one factual scenario that would support the State's charge and thereby effectively mitigated any possibility that jurors could diverge as to this element of the crime. Defendant's reliance on *Couture* is, therefore, misplaced.

## II.

¶ 25. Defendant also contends that the trial court erred in denying his motions for a judgment of acquittal pursuant to Vermont Rule of Criminal Procedure 29. Defendant moved for a judgment of acquittal twice — once after the close of the State's evidence and again after the jury returned its verdict. On appeal, he argues that the State's evidence was insufficient to sustain his conviction. Specifically, defendant claims that: (1) the State offered no evidence of an independently unlawful act, and (2) the State failed to demonstrate that defendant acted with criminal negligence.

¶ 26. Our review of the denial of a Rule 29 motion centers on whether the evidence presented by the State "sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." *State v. Lemay*, 2006 VT 76, ¶ 11, 180 Vt. 133, 908 A.2d 430 (quotation omitted). In conducting this analysis, we construe the evidence in the light most favorable to the State and exclude modifying evidence. *Id.*

---

[8] We note that defendant does not appear to rely on *Couture* for the proposition that the "mere possibility that the jury was not unanimous on an element of the offense because of the instructions" is plain error per se. *Carter*, 2004 VT 21, ¶ 26. To the extent that he does, that reading of *Couture* has been soundly rejected. *Id.*

■ ¶ 27. In light of our holding above, we find no merit in defendant's first argument in support of his motion for a judgment of acquittal. The crime of involuntary manslaughter does not include, as an element, an independently unlawful act. It follows, therefore, that the State need not introduce evidence regarding a nonexistent element.

■ ¶ 28. Nor are we convinced that the State failed to present evidence sufficient for the jury to find, beyond a reasonable doubt, that defendant acted with criminal negligence. The State introduced defendant's taped statement to the police wherein he indicated that he shouldered his high-powered hunting rifle, disengaged its safety, and proceeded to view his surroundings through the rifle's scope with his finger on or near the trigger. Prior to the gun's discharge, defendant also admitted to having seen the tractor through the scope. The State elicited testimony indicating that defendant's conduct violated numerous hunter and gun safety guidelines. Other evidence introduced by the State indicated that defendant not only pointed his loaded weapon at the tractor but also, necessarily, in the direction of several buildings beyond the tractor. Contrary to defendant's assertion, the State was not required to prove that defendant intentionally fired his rifle to demonstrate criminal negligence. Proof that defendant ran the risk of an accidental discharge while handling his firearm in the manner described above was sufficient.

■ ¶ 29. Regarding criminal negligence, defendant further argues that the State's evidence could not show that his conduct amounted to "a gross deviation from the standard of care that a reasonable person would observe in the actor's situation," *Stanislaw*, 153 Vt. at 525, 573 A.2d at 291 (quotation and emphasis omitted), because several witnesses testified to using their rifles' scopes to spot game while hunting, contrary to hunter safety guidelines and similar to defendant's actions. The fact that other hunters may engage in potentially criminally negligent behavior in other contexts does not mean, however, that, in this context, the jury could not find that defendant's actions were a gross deviation from the conduct expected of a reasonable person.

¶ 30. Defendant also insists that the evidence failed to demonstrate beyond a reasonable doubt that he "disregarded a risk of death or injury," *id.*, because no one could have anticipated that anyone would be in the tractor. Whether anyone could have

anticipated that a person would be in the tractor is irrelevant. The State's evidence amply demonstrated that defendant ignored the risk of causing the death or serious injury of all persons within gunshot range by handling his loaded weapon in such a cavalier fashion.

¶ 31. Finally, we disagree with defendant's assertion that our ruling in *State v. Free*, 170 Vt. 605, 749 A.2d 622 (2000) (mem.), indicates that we should reverse the trial court's denial of his motions for acquittal. In *Free*, we held that the State had failed to demonstrate a prima facie case of grossly negligent operation of a motor vehicle, death resulting, because the defendant's "three to four seconds" of inattention while driving, wherein he struck and killed a pedestrian, amounted only to "a mere error in judgment" or "momentary inattention." 170 Vt. at 608, 749 A.2d at 625. Considering defendant's entire course of intentional conduct, which involved numerous safety infractions amounting to a blatant disregard of hunter safety norms, we find *Free* inapposite.

## III.

¶ 32. Defendant also contends that the information charging him with involuntary manslaughter was defective. According to defendant, the information omitted an element of the crime — an independently unlawful act — and cannot, therefore, "serve as the basis of [his] conviction." *State v. Kreth*, 150 Vt. 406, 408, 553 A.2d 554, 555 (1988). In light of our ruling above, we find no merit in defendant's claim that the information was defective. An independently unlawful act *is not* an element of the crime of involuntary manslaughter; therefore, it need not be set forth in the information.

*Affirmed.*