NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 36

No. 2017-403

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Caledonia Unit, |
| | Criminal Division |
| | |
| Melissa Robitille | December Term, 2018 |

Thomas A. Zonay, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Seibert, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund and Robinson, JJ., and Teachout, Supr. J. and Howard, Supr. J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** Defendant Melissa Robitille appeals her conviction for involuntary manslaughter for the death of her son. She argues that the trial court violated the Confrontation Clause when it restricted cross-examination of the State's key witness; that the State produced insufficient evidence to support a conviction; and that the court erred in failing to provide a specific unanimity instruction to the jury. We affirm.

## I. Facts

¶ 2. The central facts presented at trial are as follows. They are undisputed except as noted. Defendant's thirteen-year-old son I.R. required twenty-four-hour care due to a birth defect

called holoprosencephaly[1], in which the brain fails to separate into two lobes during gestation and instead remains partially fused. Related to the holoprosencephaly, I.R. had only one eye and was blind or severely vision-impaired; he had no external ears and had severely impaired hearing; he could not talk normally; he could not walk independently; and he could not eat or drink through his mouth. In order for I.R. to eat or drink, his parents and caretakers put food or water into a feeding/water bag and then connected the bag to a feeding tube, which connected to a feeding port inserted into I.R.'s stomach (called the "MIC-KEY"). At the time of I.R.'s death, he weighed forty-nine pounds and was fifty inches tall. Also related to the holoprosencephaly, I.R. experienced many endocrine disorders. One of these, diabetes insipidus, required assiduous attention to his fluid balance. I.R. attended school and was learning sign language. He lived with and was cared for by his parents, with support from caregivers.

¶ 3.     I.R.'s father died in January 2014. Defendant met Walter Richters online soon afterwards. In March 2014, she invited him to move from Missouri to live with her, which he did. Richters did not work or take care of I.R. Defendant worked a night shift and relied on caregivers to assist with I.R.'s care.

¶ 4.     In August 2014, while the caregivers were on vacation, defendant took time off work to care for her son. On the evening of August 21, 2014, defendant, Richters, and I.R. were at home in the kitchen, and defendant fed I.R. his dinner. Testimony differed about what happened next. Richters testified that defendant poured around one shot of vodka into I.R.'s feeding bag (equivalent to around one ounce).[2] Richters admitted during trial that this testimony contradicted

---

[1] There are three types of holoprosencephaly, which exist on a spectrum of severity: lobar (most severe), semilobar (less severe), and alobar (least severe). I.R. was diagnosed with semilobar holoprosencephaly during his life, but the medical examiner determined that he had experienced lobar holoprosencephaly. The distinctions are not important to this opinion, so we refer to the condition simply as holoprosencephaly.

[2] Defendant represented that one shot of vodka was equivalent to around one ounce or thirty cubic centimeters (cc's). An expert witness agreed that one shot was equivalent to one

2

his prior statements under oath, in a deposition and a police interview, in which he said that he had poured the vodka into the bag. In contrast to Richters's trial testimony, defendant testified that Richters poured fifteen cubic centimeters (cc's) of vodka into the feeding bag (equivalent to around half an ounce). Like Richters, defendant's testimony at trial contradicted her prior statements under oath in interviews with the police, in which defendant told police that she had poured the vodka. Defendant also testified that she diluted the vodka with water after Richters poured the vodka into the bag. Both defendant and Richters testified that it was defendant who connected the feeding bag to I.R.'s feeding port. They also agreed that I.R. seemed to be experiencing pain that evening, and that Richters suggested administering the alcohol to alleviate his discomfort. However, in defendant's prior statements with police, she had said that her son was very sleepy that evening, and she had not mentioned any unusual discomfort.

¶ 5.    After receiving the alcohol, I.R. stayed with defendant and Richters in the kitchen for a short time while defendant played a video game. I.R. appeared calmer. Defendant testified that Richters was drinking vodka and Dr. Pepper during this time and that he had multiple opportunities to add alcohol to I.R.'s feeding bag without her knowledge when he went to the bathroom, which was located behind defendant. Richters testified that he did not begin drinking until after I.R. went to bed, but he also testified that he did not remember when he started drinking. Richters stated that I.R. was given nothing else before I.R. went to bed. Over the course of the night, Richters drank a fifth of vodka, mixed with Dr. Pepper. At some point after I.R. went to bed and before Richters or defendant went to bed, Richters "passed out" from drinking alcohol. Richters went to bed around 1:45 a.m., and defendant went to bed around 2:00 a.m. She checked on her son first and he appeared fine, and she left his baby monitor on "full blast." She woke at

---

ounce. Another expert witness described one shot of vodka as equivalent to 1.5 ounces or forty-five milliliters.

9:00 a.m. and went to her son's room to care for him, and she discovered he had died. Defendant shouted to Richters that he should call 911, which he did.

¶ 6. There was an autopsy performed on I.R.'s body. The autopsy showed that I.R.'s blood alcohol content (BAC) was 0.146. He also had caffeine in his system. The medical examiner determined I.R.'s cause of death was his medical condition, holoprosencephaly, with a contributory cause of acute ethanol toxicity. In other words, his blood-alcohol level, combined with his holoprosencephaly, caused his death.

¶ 7. Subsequently, defendant and Richters were arrested and charged with second-degree murder, which requires a minimum sentence of twenty years and a maximum sentence of life imprisonment. 13 V.S.A. § 2303(a)(2). The State later amended both charges to involuntary manslaughter, which carries a sentence of one to fifteen years' imprisonment. Id. § 2304. Richters pleaded guilty and agreed to testify for the prosecution as part of his plea agreement. He received a sentence of four to fifteen years, split to serve three years. Defendant proceeded to a jury trial and was convicted of involuntary manslaughter in April 2017. She was sentenced to four to twelve years. Defendant timely appeals.

¶ 8. Defendant makes three arguments on appeal: (1) the trial court impermissibly restricted cross-examination of the State's key witness; (2) the State presented insufficient evidence to sustain her conviction; and (3) the court committed plain error in not providing jurors with a unanimity instruction. We consider each argument in turn.

## II. Cross-Examination

¶ 9. Defendant makes two claims regarding the cross-examination of Richters, the prosecution's key witness. First, she argues that the court made an erroneous finding that the State amended Richters's charge independently of the plea deal, which impermissibly limited his cross-examination. Second, she argues that the court limited Richters's cross-examination in a way that

4

violated her right to confrontation under the Sixth Amendment to the U.S. Constitution.[3] The specific facts underlying these arguments are presented below.

¶ 10. Prior to trial, defendant indicated to the court that she intended to question Richters about his plea deal with the State. Specifically, she asked to highlight the potential sentence he faced at the time he agreed to testify. This request initiated a discussion about two things: (1) whether Richters faced a sentence for second-degree murder or manslaughter at the time he agreed to testify, and (2) whether the court should permit questioning regarding the actual number of years Richters faced, rather than more general questioning about how his plea deal secured a reduced sentence.

¶ 11. Defendant contended that Richters was facing a sentence for second-degree murder at the time he agreed to testify. The State represented that Richters was facing a sentence for manslaughter. It had amended his charge from second-degree murder to manslaughter independently of Richters's plea deal, in response to a prior judge's indication that the evidence would not support a second-degree-murder charge. The court then asked defense counsel, "[W]hat does the second degree have to do with this case, then?" Defense counsel answered, "I'm not in a position to raise it at this point. I can't." This concluded the discussion about Richters's actual exposure at the time he agreed to testify.

¶ 12. The court and the parties also discussed whether defendant should be permitted to elicit testimony about the specific sentence Richters faced, in number of years, rather than more general questioning about the reduced sentence. The State contended that it would be prejudicial to discuss the specific sentence, given that defendant was charged with the same crime as Richters. The court ruled that defendant could ask what sentence Richters actually received according to his

---

[3] Defendant also states that the court violated her right to confrontation under Chapter One, Article Ten of the Vermont Constitution, but she does not discuss that claim in her brief. We therefore address only her claim of a violation under the U.S. Constitution. State v. Taylor, 145 Vt. 437, 439, 491 A.2d 1034, 1035 (1985) (declining to address state constitutional issues that were inadequately briefed).

5

plea agreement and elicit testimony that Richters had faced "higher exposure" before agreeing to testify. But she could not ask "about the potentials or what he was facing, the numbers." The court reasoned that the more general testimony would achieve defendant's purpose, and the Sixth Amendment did not require the court to permit defendant to ask about the specific sentence, in number of years, that Richters faced.

¶ 13. At trial, Richters testified that he received a sentence of four to fifteen years, split to serve three years. Richters affirmed that this sentence meant he would serve three years in jail and would not serve more time unless he violated probation. The plea agreement was entered into evidence. Defense counsel also asked, "In general, not as part of the plea agreement, but wasn't it true that you were facing more than three years, in general . . . on this charge? And isn't it true that you agreed to testify as part of getting the smaller amount of jail time?" Richters said yes.

A. Court's Finding Regarding Amended Charge

¶ 14. First, we review defendant's argument that the court limited Richters's cross-examination based on an erroneous factual finding that he was facing a manslaughter charge, not a second-degree-murder charge, when he agreed to testify. It is not clear whether the court made a finding here; rather, it appears that defense counsel conceded he could not argue that the second-degree-murder charge was relevant, and the court proceeded to the next issue. To the extent the court's conduct can be construed as a finding, we hold there was no error. We uphold a trial court's factual findings if there is credible evidence in the record to support the finding. State v. Patten, 2018 VT 98, ¶ 4, __ Vt. __, 197 A.3d 873. The record indicates that a different trial judge, earlier in the proceedings, expressed skepticism that the State could prove second-degree murder here; the State admitted the second-degree-murder charge was weak months before the charge was amended; the charge was reduced for the defendant, as well, around the same time; and the prosecutor represented that the amendment was wholly independent of the plea agreement. The record supports a finding that the State amended the charge independently of the plea agreement.

6

Therefore, we cannot conclude that the trial court limited cross-examination based on an erroneous factual finding.

¶ 15.    Defendant contends that Richters's understanding, not his actual exposure, should be determinative in deciding whether to admit the evidence. The State contends that this issue was not preserved. See State v. Ovitt, 2005 VT 74, ¶ 13, 178 Vt. 605, 878 A.2d 314 (mem.) ("An issue is not preserved for appeal unless a party raises it with specificity and clarity below, thereby ensuring that the trial court will have an opportunity to fully develop the relevant facts and to reach considered legal conclusions."); see also State v. Sole, 2009 VT 24, ¶ 13, 185 Vt. 504, 974 A.2d 587 (affirming that "preservation rule exists so that the trial court can address any correctable errors before they are presented here, and develop an adequate record for any appeal" and concluding "[d]efendant's argument [was] unpreserved because . . . [he] did not raise this particular issue in a manner requiring a ruling by the district court").

¶ 16.    We agree that the issue was not preserved. Although the record shows that defendant mentioned Richters's understanding, her argument was entirely focused on his actual exposure at the time he agreed to testify. In fact, when the State represented that it had amended the charge independently of the plea deal—a representation relevant to what Richters actually faced, not what he thought he faced—defendant conceded that she could not maintain that the second-degree-murder charge was relevant. Instead, she argued that she should be allowed to question Richters regarding the fifteen-year sentence for manslaughter. In short, defendant never presented to the trial court "with specificity and clarity" the argument that she now advances. Ovitt, 2005 VT 24, ¶ 13. Therefore, the trial court had no opportunity to rule on the matter. There is no decision on that point for us to review.

## B. Confrontation Clause

¶ 17.    Next, we consider defendant's argument that the court violated her constitutional right to confrontation by limiting Richters's cross-examination. See U.S. Const. amend. VI. She

7

argues that the court should have allowed her to inquire into the potential sentence Richters faced, in number of years, at the time that he agreed to testify. She reasons that the jury could not sufficiently evaluate the "magnitude of his motive" to testify without learning the specific details of his exposure.[4]

¶ 18. The Sixth Amendment to the U.S. Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The right to confrontation guarantees a defendant the right to cross-examine a witness. Davis v. Alaska, 415 U.S. 308, 315 (1974) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." (quotation omitted)). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," and "the exposure of a witness' motivation in testifying is a proper and important function" of that right. Id. at 316. Cross-examination satisfies the Sixth Amendment's guarantee if the defendant is "allowed the opportunity to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." State v. Raymond, 148 Vt. 617, 621, 538 A.2d 164, 166 (1987) (quotation omitted); see also United States v. Klauer, 856 F.2d 1147, 1149 (8th Cir. 1988) ("The limitation of cross-examination results in constitutional error where a reasonable jury might have received a significantly different impression of the witness' credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." (quotation and alterations omitted)).

¶ 19. However, although "the Confrontation Clause guarantees an opportunity for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S.

---

[4] In the context of this constitutional claim, defendant reiterates her argument that Richters's understanding, rather than his actual exposure, is determinative. Again, defendant did not present this issue below, and there is no trial court decision on this point for us to review.

15, 20 (1985); see also State v. Larose, 150 Vt. 363, 369, 554 A.2d 227, 231 (1988) (emphasizing right to confrontation is not "a mandate for cross-examination on anything the defendant desires" and quoting Fensterer, 747 U.S. at 20). "Once a defendant has been afforded the opportunity for sufficient cross-examination to satisfy the Sixth Amendment guarantee, the trial court has discretionary authority to control the scope of further cross-examination." Raymond, 148 Vt. at 621, 538 A.2d at 166 (quotation and alterations omitted); see also State v. Cartee, 161 Vt. 73, 77, 632 A.2d 1108, 1111 (1993) (holding that Sixth Amendment does not "prevent a trial court from imposing reasonable limits on cross-examination into the partiality of a prosecution witness" and affirming that "a court retains wide latitude 'to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). Moreover, the Confrontation Clause protects only the admission of evidence that is relevant and admissible. State v. Findlay, 171 Vt. 594, 595, 765 A.2d 483, 486 (2000) (mem.) (affirming defendant's right under federal and Vermont constitutions to "present exculpatory evidence" and "confront witnesses brought against him, where the evidence is relevant and admissible under the rules of evidence" (quotation omitted)).

¶ 20.    Our question, then, is what level of inquiry is sufficient to "satisfy the Sixth Amendment guarantee." Raymond, 148 Vt. at 621, 538 A.2d at 166. We previously have held that it violates the Confrontation Clause to prohibit all inquiry into a witness's motivation to testify. In State v. Findlay, we determined that the trial court committed reversible error in prohibiting all evidence related to other police-controlled drug purchases involving the State's witness and a police informant, where the State's case relied primarily on the testimony of that witness regarding a controlled drug purchase between the police informant and the defendant. 171 Vt. at 596, 765 A.2d at 486-87. We reasoned that without evidence of the police informant's actions in other police-controlled drug purchases, "the jury was left without the benefit of a reasonably complete

9

understanding of the [drug purchase underlying the conviction] as presented by [the witness]; thus, cross-examination was significantly undermined." Id. Similarly, we ruled in State v. Cartee that the court committed reversible error when it "allowed no inquiry into the possibility that [the witness] . . . was motivated to fabricate" his story, given an ongoing investigation. 161 Vt. at 77, 632 A.2d at 1111. We observed that without the excluded testimony, "the jury was left without benefit of a reasonably complete understanding of [the witness's] account." Id.; see also State v. Banis, 2018 WL 3913203, at *3 (Vt. Aug. 6, 2018) (unpub. mem.) (upholding trial court's restriction on cross-examination because "the court . . . did not prohibit all questioning into the [witness's] possible motive to fabricate her story," unlike in Findlay, 171 Vt. at 596, 765 A.2d at 486-87, or Cartee, 161 Vt. at 77-78, 632 A.2d at 1111).

¶ 21.     In this case, we consider a different issue: whether it violates the Confrontation Clause for a court to restrict some, but not all, inquiry into a witness's motivation to testify. More specifically, we consider whether the Confrontation Clause requires the trial court to permit inquiry into the specific details behind a cooperative witness's agreement with the prosecution. Other courts disagree on this question. For example, the First Circuit held in United States v. Luciano-Mosquera that the district court did not violate the Confrontation Clause in prohibiting cross-examination into the specific penalties the cooperating witness would have faced had he not agreed to testify. 63 F.3d 1142, 1153 (1st Cir. 1995), as amended (Sept. 28, 1995). The First Circuit reasoned that because the defendant "was able to ask [the witness] repeatedly whether he had received a benefit for his testimony," he "had a sufficient opportunity to expose potential biases" and "there [was] sufficient evidence before the jury (absent the excluded evidence) from which the jury could make a discriminating appraisal of possible biases and motivations of the witnesses." Id. (quotation omitted). The cross-examination the court permitted met "the minimal constitutional threshold level of inquiry" under the Sixth Amendment. Id.

10

¶ 22. In contrast, the Third Circuit determined in United States v. Chandler that the trial court should have permitted inquiry into the specific sentences to which the cooperating witnesses were exposed at the time they agreed to testify. 326 F.3d 210, 222 (3d Cir. 2003). The Third Circuit did not hold that a trial court should allow such inquiry in all cases. Rather, the court reasoned that the proper inquiry was "whether, if the trial court had not prohibited [the defendant] from cross-examining [the witnesses] with respect to the magnitude of the sentence reduction they believed they had earned, or would earn, through their testimony, the jury might have received a significantly different impression of their credibility." Id. at 221 (quotation and alterations omitted). In that case, one of the cooperating witnesses received a 21-month to 27-month sentence, reduced from a 97-month to 121-month sentence. The other witness was facing a sentence of 151 to 188 months and expected a reduction. The Third Circuit concluded that based on those facts, the district court violated the Confrontation Clause in restricting the scope of cross-examination to exclude inquiry into the specific sentences the witnesses faced prior to testifying. Id. at 222. This was because "a reasonable jury could have reached a significantly different impression of [the witnesses'] credibility had it been apprised of the enormous magnitude of their stake in testifying against [the defendant]." Id.

¶ 23. We do not find it necessary to decide whether we find the Luciano-Mosquera approach or the Chandler approach more persuasive because the court did not violate the Confrontation Clause here under either approach. Defense counsel was able to elicit testimony that Richters received a reduced sentence in exchange for his agreement to testify. Under the Luciano-Mosquera approach, this testimony was sufficient "to expose potential biases." 653 F.3d at 1153 (quotation omitted). Further inquiry into the specific sentence to which Richters was exposed was not necessary to provide the jury a "reasonably complete understanding" of his motivation in testifying. Findlay, 171 Vt. at 596, 765 A.2d at 486; Cartee, 161 Vt. at 77, 632 A.2d at 1111. If we were to adopt the Luciano-Mosquera approach, the cross-examination the court

permitted would meet "the minimal constitutional threshold level of inquiry" under the Sixth Amendment, and there would be no error. 63 F.3d at 1153.

¶ 24. Nor would we find error here if we were to adopt the Chandler approach. The trial court prohibited the defense from eliciting testimony about what sentence Richters was facing for involuntary manslaughter—which was a maximum sentence of fifteen years.[5] But it did permit Richters to testify that he was sentenced to four to fifteen years in prison, split to serve three, which meant he would spend no more than three years in jail unless he violated probation. In short, Richters was facing fifteen years, and the jury was informed that he received fifteen years, reduced to three years to serve if he complied with probation. Based on these facts, we cannot find that the "magnitude of the sentence reduction" Richters received here was such that "the jury might have received a significantly different impression of [Richters's] credibility" if the judge had allowed more details of the sentencing agreement. Chandler, 326 F.3d at 221. If we were to adopt the Chandler approach, we would conclude there was no error.

¶ 25. Thus, without deciding whether to adopt the Luciano-Mosquero approach or the Chandler approach, we hold that the court appropriately exercised its discretion and did not violate the Confrontation Clause in excluding testimony about the number of years Richters faced at the time he agreed to testify.

### III. Sufficiency of the Evidence

¶ 26. Next, we consider defendant's argument that the State produced insufficient evidence to sustain her conviction. Specifically, defendant claims that the State failed to prove the elements of causation and criminal negligence. In addition to the facts recited above, the following evidence is pertinent to these arguments.

---

[5] As we have explained, defense counsel conceded that the initial murder charge was not relevant to the plea agreement, and the testimony the defense sought to elicit was related to the involuntary-manslaughter charge. We also have explained that defendant did not preserve the issue of what Richters thought he was facing.

12

A. Evidence at Trial

¶ 27.  Four expert witnesses testified for the State at trial: Dr. Paul Zimakas, I.R.'s pediatric endocrinologist; Dr. Sarayu Balu, I.R.'s pediatrician; Dr. Peter Bingham, I.R.'s pediatric neurologist; and Dr. Elizabeth Bundock, the State's chief medical examiner.  I.R.'s doctors testified that alcohol was a "toxin" that could have a negative effect on someone with I.R.'s medical conditions, particularly considering his diabetes insipidus condition.  They reported that they had never discussed alcohol with defendant, would not have expected to need to talk about alcohol, and would never have recommended giving I.R. alcohol.  Dr. Bingham also stated that he would not have anticipated that one shot of alcohol would have been fatal to I.R.  He said that the larger the "dose" of the "toxin," the greater the negative effect.  Dr. Balu testified that she thought it was understandable that someone in defendant's situation would give a child alcohol, thinking it might calm the child and not harm him.

¶ 28.  The medical examiner testified at length about the negative effects alcohol produces on the body.  Whether those negative effects overwhelm the body's ability "to compensate" and cause the body's "systems . . . to start to fail significantly" depends on the person's age, size, weight, and medical conditions.  A person's body will be less able to cope with the negative effects of alcohol if other problems are already present, such as natural diseases or problems with the endocrine, digestive, respiratory, or brain systems.  Thus, for some people, even a small amount of alcohol could be fatal.  She indicated that while a shot of vodka will "yield a BAC," the BAC would depend on the person.  She said there was very little scientific research available on the effects of alcohol on children and teenagers and none on the effects of alcohol on someone with holoprosencephaly.

¶ 29.  With regard to I.R., Dr. Bundock asserted that she could not calculate what amount of alcohol I.R. received based on his BAC at death.  She reported that, in her general experience examining persons who have died due to alcohol consumption, one shot of vodka would not

13

produce a 0.146 BAC. She observed that a 0.146 BAC would not usually be fatal to healthy adults or teenagers, but it may be fatal for some individuals, depending on their physiology and medical conditions. She agreed that most people would not think that one shot of alcohol would prove fatal for anyone.

¶ 30.    Dr. Scott Lukas, a psychopharmacologist, testified for the defense. He estimated that for a healthy teenager, it would take 1.5 shots of vodka to produce a 0.146 BAC—four times the amount defendant admitted to providing I.R.[6] He testified that fifteen milliliters could not have produced I.R.'s BAC at death, and he would have had to ingest six times that amount in order to produce a 0.146 BAC.[7] He affirmed that there was no scientific research available on the effects of alcohol on someone with holoprosencephaly. He opined that most people would not have thought that a small amount of alcohol would be harmful.

¶ 31.    It is also pertinent that both defendant and Richters, the State's key witness, admitted to lying in previous statements under oath. Richters initially told police that defendant had poured alcohol into I.R.'s bag, and then he told police that he did. He also said during a deposition that he put the alcohol in the bag. He told police that he did not start drinking until after I.R. went to bed, which is what he initially said at trial; later in the trial, he said he could not remember when he started drinking.

¶ 32.    Defendant initially told police that she and Richters had never talked about giving I.R. alcohol prior to August 21, but at trial she said they had been talking about it for several weeks. She told police they were both drinking at a slow pace, and at trial she said that Richters was "guzzling it down pretty darn fast." She told police she may have given I.R. Mio, an energy drink,

---

[6] Defendant and Dr. Lukas used different measurements for a shot of vodka. Defendant said a shot was around thirty cc's or one ounce. Dr. Lukas said that a shot was around 45 milliliters or 1.5 ounces.

[7] Defendant admitted to administering fifteen cc's to I.R. Dr. Lukas referred to this amount as fifteen milliliters.

and then at trial she was sure she had not. She did not disclose the alcohol in her initial interviews with police, and then when she did so, she said that she had poured the vodka into I.R.'s bag. At trial, she asserted that Richters had poured the vodka.

## B. Analysis

¶ 33. When a defendant challenges the sufficiency of the evidence supporting a conviction, we "review the evidence presented by the State viewing it in the light most favorable to the prosecution and excluding any modifying evidence, and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." State v. Brochu, 2008 VT 21, ¶ 21, 183 Vt. 269, 949 A.2d 1035 (quotation omitted). The fundamental inquiry is whether "the jury by way of a process of rational inference could conclude beyond a reasonable doubt that defendant committed the acts for which [she] was charged." State v. Godfrey, 2010 VT 29, ¶ 18, 187 Vt. 495, 996 A.2d 237 (quotation omitted). If so, we will not disturb the jury's considered judgment. Id. "Defendant faces a heavy burden in arguing on appeal that we should overturn the jury's unanimous verdict . . . ." Id. ¶ 13; see also State v. Couture, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999) ("[A] judgment of acquittal is proper only if the prosecution has failed to put forth any evidence to substantiate a jury verdict.").

¶ 34. In applying this standard of review, we keep in mind that the "jury is the sole judge of the credibility of the witnesses whether they be expert or nonexpert." State v. Billado, 141 Vt. 175, 189, 446 A.2d 778, 786 (1982); see also State v. Freeman, 2004 VT 56, ¶ 8, 177 Vt. 478, 857 A.2d 295 (mem.) ("Given the inherent difficulty in evaluating demeanor, mannerisms, and tone of voice, in addition to the quality of testimony itself, we defer to the factfinder's determination of the credibility of the witness, and the persuasive effect of his testimony."). Although the evidence may be "susceptible to multiple interpretations, not all of which point toward guilt," it is not our role to second-guess the interpretations of the jury. State v. O'Neill, 2019 VT 19, ¶ 35, __ Vt. __, __ A.3d __. Rather, we determine only "whether the State's theory of the evidence could fairly

support the conviction." Id.; see also State v. Dragowsky, 169 P.3d 1271, 1272 (Or. Ct. App. 2007) (explaining that in applying this standard of review, appellate court "resolve[s] any conflicts in the evidence in favor of the state, give[s] the state the benefit of all reasonable inferences that may properly be drawn, and accept[s] the factfinder's reasonable credibility choices").

¶ 35. The elements of involuntary manslaughter derive from the common law, not from statute. State v. Viens, 2009 VT 64, ¶¶ 13, 17, 186 Vt. 138, 978 A.2d 37. Vermont's manslaughter statute provides a penalty but does not define the elements of the crime. Id. ¶ 13; see also 13 V.S.A. § 2304 (providing penalty for manslaughter). To prove that a defendant committed involuntary manslaughter, the State must show that the defendant caused the death of another human being, and it must show that the defendant did so with the intent of criminal negligence. State v. Wheelock, 158 Vt. 302, 310, 609 A.2d 972, 977 (1992), overruled on other grounds by State v. Congress, 2014 VT 129, 198 Vt. 241, 114 A.3d 1128 ("Involuntary manslaughter is the killing of another human being as a result of criminal negligence." (emphasis omitted)); see also Viens, 2009 VT 64, ¶¶ 17-19 (noting that crime requires "minimum culpability level of criminal negligence"). A defendant acts with criminal negligence when she

> disregard[s] a risk of death or injury of such a nature and degree that
> [her] failure to perceive it, considering the nature and purpose of
> [her] conduct and the circumstances known to [her], involves a gross
> deviation from the standard of care that a reasonable person would
> observe in the actor's situation.

Id. ¶ 17 (quotation and emphasis omitted).

¶ 36. Defendant claims that the evidence was insufficient to establish causation. She points out that "[t]he jury may employ rational inferences to bridge factual gaps left by circumstantial evidence, but at some point rational inference leaves off and speculation begins." State v. Durenleau, 163 Vt. 8, 14, 652 A.2d 981, 984 (1994). In her view, the evidence supported a conclusion that defendant gave I.R. one ounce of vodka, which could not have caused his death. According to defendant, no evidence established who supplied the additional alcohol that did cause

16

I.R.'s death. Only conjecture, defendant asserts, could bridge the gap in the evidence and lead the jury to conclude that it was defendant who supplied the additional alcohol.

¶ 37. We disagree. When we view the evidence in the light most favorable to the State and exclude modifying evidence, the following facts regarding causation are presented. Defendant gave I.R. at least one ounce of vodka, and she had additional opportunities to administer more alcohol to him. Richters did not give I.R. any alcohol. No one else was present who could have given I.R. alcohol. Although I.R.'s doctors would not have expected one ounce of alcohol to kill him, he weighed forty-nine pounds at the time; he was extremely vulnerable to fluid imbalances due to his diabetes insipidus and other conditions; even a small amount of alcohol could be fatal, and the risk would increase with the amount. Based on this evidence, the jury could reasonably infer beyond a reasonable doubt that defendant gave I.R. more than one ounce of alcohol and that, in doing so, she caused his death. Although defendant urges a different theory of the evidence, we must conclude the evidence is sufficient to prove the State's theory regarding causation beyond a reasonable doubt. See O'Neill, 2019 VT 19, ¶ 35.

¶ 38. Defendant also argues that the evidence was insufficient to establish criminal negligence. She points to the acknowledgment of I.R.'s pediatric neurologist that he would not have anticipated that one ounce of vodka would have caused I.R.'s death, asserting that if the risk was not foreseeable, then defendant could not have acted with criminal negligence.

¶ 39. Defendant's argument fails for two reasons. First, the question is whether defendant acted with criminal negligence in giving I.R. more than one ounce of alcohol, not just one ounce, given that there was sufficient evidence for the factfinder to infer that defendant gave I.R. more than one ounce of alcohol. Second, criminal negligence does not require that defendant foresaw that she would kill her son if she gave him alcohol. That would be a different standard; that would be disregarding a certainty of death. Criminal negligence exists when the actor disregarded a "risk of death or injury." Viens, 2009 VT 64, ¶ 17 (quotation omitted and emphasis

17

added). And the actor must have disregarded that risk "of such a nature and degree that [her] failure to perceive it, considering the nature and purpose of [her] conduct and the circumstances known to [her], involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." Id. (emphasis omitted).

¶ 40. Here, again viewing the evidence in the light most favorable to the State and excluding modifying evidence, there was testimony produced at trial regarding I.R.'s vulnerable condition, his diabetes insipidus, the lack of research on the effects of alcohol for someone with holoprosencephaly, and the statements by I.R.'s doctors that no one would or should give I.R. any amount of alcohol. The testimony also showed that defendant was intimately involved in I.R.'s care and fully understood I.R.'s vulnerable condition, particularly the importance of maintaining his fluid balance and the dangers posed by dehydration. Further, defendant's refusal to disclose to the police that she had given I.R. alcohol on the night that he died, and the fact that she turned on I.R.'s baby monitor "full blast" because of the alcohol she gave him that night, indicate her own awareness that alcohol could cause risks for her son. While I.R.'s doctors indicated that they would not have anticipated that one ounce of alcohol would prove fatal, they clearly testified that alcohol posed significant risks to I.R. and that those risks would increase with the amount of alcohol given to him. This evidence was sufficient for the jury to reasonably infer that in giving I.R. more than one ounce of vodka, defendant acted with criminal negligence.

IV. Unanimity Instruction

¶ 41. Finally, we address defendant's argument that the court erred in failing to provide the jury a specific unanimity instruction. Defendant argues that the evidence supported two competing theories as to the cause of I.R.'s death. One theory was that defendant administered all the alcohol that caused I.R.'s death. Another theory was that defendant administered the initial alcohol to I.R.; Richters later added more alcohol to the bag that defendant knew or should have known about; and together the doses of alcohol killed I.R. Defendant contends that because the

18

evidence presented two viable theories regarding causation, the court was required to specifically instruct the jury that they must decide unanimously on which set of facts supported the conviction.

¶ 42. The facts that are relevant to this argument are as follows. As we explained above, defendant and Richters presented conflicting testimony at trial. Defendant testified that Richters poured around half an ounce of vodka into I.R.'s feeding bag, and she added water and connected the bag to his feeding port. Richters testified that defendant poured around an ounce of vodka into I.R.'s feeding bag and then connected the bag to his feeding port. They both testified that after defendant administered the alcohol, I.R. stayed in the kitchen for a short time before going to bed.

¶ 43. In addition to this testimony, defendant suggested that during this time before I.R. went to bed Ricthers "could have dumped some of his drink into [I.R.'s] feeding/water bag." Defendant testified that she was absorbed in playing her video game; Richters got up often to go to the bathroom; he had to walk behind her to get to the bathroom; and I.R. was also behind defendant. She said "[i]t wouldn't take very long at all" to pour vodka into the bag and that she was not paying attention to Richters at that time.

¶ 44. In closing, the prosecutor criticized defendant's theory that Richters had poured additional alcohol into I.R.'s bag without defendant's knowledge. The prosecutor argued that there was no proof that any extra alcohol was added, that Richters would have had no motive to give I.R. more alcohol after he had calmed down, and it was unreasonable to think Richters could have given I.R. more alcohol without having defendant notice. The prosecutor emphasized that the case was "not about Walter Richters" and was "about the defendant," who was the "only person who admitted actually giving vodka to her son." She concluded that either Richters or defendant may have poured the alcohol into I.R.'s bag before defendant attached the feeding bag to I.R.'s feeding port, but defendant was "the one that actually attached that bag to her son's stomach," causing I.R.s death.

¶ 45. During jury deliberations, a juror asked: "Can [defendant] be found guilty of essential element No. 2 [that defendant caused I.R.'s death] even if [Richters] had snuck some more alcohol into the bag?" After consulting with the prosecutor and defense counsel, the trial court answered: "In determining whether the State has established each of the essential elements, you must find the facts from the evidence in the case and you must apply the law that you have been given in the jury instructions." The initial jury instructions informed the jury that "[b]efore [defendant] can be found guilty of the charge, the State must have proven each of the essential elements beyond a reasonable doubt." With regard to the element of causation, the court explained that defendant must be proven to have "caused the death of [I.R.] by causing alcohol to be ingested by [I.R.], resulting in acute ethanol toxicity and death." The court also stated, "In order to return a verdict of guilty or not guilty, you must all agree. Your verdict must be unanimous." Four minutes after the court returned its answer, the jury delivered its guilty verdict.

¶ 46. Defendant did not preserve this objection below, so we will reverse only if there is plain error. State v. Nicholas, 2016 VT 92, ¶ 13, 203 Vt. 1, 151 A.3d 799. "When reviewing alleged plain error in a jury instruction, we determine whether there was obvious error affecting the defendant's substantial rights, thereby resulting in prejudice to the defendant and seriously affecting the fairness or integrity of the judicial proceedings." Id.; see also State v. Buckley, 2016 VT 59, ¶ 15, 202 Vt. 371, 149 A.3d 928 (stating four-part test for plain error). "We review jury instructions as a whole, assigning error only when the entire charge undermines confidence in the verdict." State v. Green, 2006 VT 64, ¶ 7, 180 Vt. 544, 904 A.2d 87 (mem.) (quotation omitted). "The Court will find plain error only in extraordinary cases." Id.

¶ 47. The Vermont Constitution ensures a defendant's right to a unanimous jury verdict. Vt. Const. ch. I, art. 10; see also V.R.Cr.P. 31(a) ("The verdict shall be unanimous."). Based on this provision, we have held that "where there is evidence of more than one act that would constitute the offense charged, the State must specify the act for which it seeks a conviction." State

20

v. Gilman, 158 Vt. 210, 215, 608 A.2d 660, 664 (1992). This is to protect against "the possibility that part of the jury will base its decision to convict on evidence of conduct different from that considered by the rest of the jury," depriving the defendant of "a unanimous verdict based on a single offense." Id.

¶ 48. Alternatively, if the State does not make this election, the trial court may provide "an instruction requiring the jury to be unanimous in determining which act supports a conviction." Nicholas, 2016 VT 92, ¶ 22. This is a "specific unanimity instruction," as distinguished from a "general unanimity instruction," which informs the jury generally that they must agree unanimously on the verdict. Id. ¶¶ 22-24; Green, 2006 VT 64, ¶ 8. A specific unanimity instruction is required in some cases, and its omission may constitute plain error. For example, in State v. Couture, the State alleged one count of kidnapping based on the defendant's allegedly kidnapping several different people. 146 Vt. 268, 502 A.2d 846. In that context, a general instruction on unanimity was insufficient because it "permit[ed] the jury to convict [the] defendant for kidnapping, without assuring its unanimity regarding the essential element of [the] defendant's confinement of a particular person." Id. at 272, 502 A.2d at 849; see also State v. Bellanger, 2018 VT 13, ¶¶ 11, 16, 18, __ Vt. __, 183 A.3d 550 (finding error, but no plain error, when jury instruction did not require unanimity on which alleged incidents of sexual assault supported conviction because "it [was] neither logically nor reasonably likely that the jurors would have reached a different verdict had the trial court given a specific unanimity instruction").

¶ 49. This is an entirely different kind of case. Here the State did not seek conviction based on multiple distinct acts. Rather, it alleged that defendant gave I.R. enough alcohol on the night of August 21, 2014, to cause I.R.'s death. The "alternative theory" to which defendant refers was suggested by defendant, not the State—that Richters, not defendant, administered sufficient alcohol to kill I.R. This is not an "alternative theory" of prosecution. It is a defense. A criminal defendant in a jury trial will always present an alternative theory of events, in which the defendant

21

is not guilty. This divergence of viewpoint between the prosecution and the defendant does not require the court to give a specific unanimity instruction. Nor does the juror's question convert the defendant's version of events into an alternative theory of prosecution.

¶ 50. Defendant contends that the prosecutor "alluded to the alternative theory" and argued that defendant was responsible for I.R.'s death even if Richters poured alcohol into the bag because "the jurors could fairly infer that [defendant] knew about it." This mischaracterizes the record. The prosecutor's comments were not alluding to or asserting an alternative theory of prosecution. Rather, they were rejecting the defense's theory of the case. In referring to whether defendant would have noticed, the prosecutor was impugning the credibility of the defense, not suggesting that defendant knew or should have known about additional alcohol. We see no basis for disturbing the jury's conclusion that defendant was guilty.

Affirmed.

FOR THE COURT:

_____

Chief Justice